## NEW YORK COMMON PLEAS.

### Edward De Rutte agt. The New York, Albany and Buffalo Electro Magnetic Telegraph Company.

When a *telegraph company is paid* for the transmission of a message to a place beyond their own lines, with which they are in communication by the agency of other companies, they must be regarded as undertaking that the message will be transmitted and delivered *at that place.* And if injured by its non-fulfillment, the party interested has a right to look to them for compensation for the injury sustained.

De Rutte agt. The New York, &c., Telegraph Company.

A party who is *interested* in the correct or diligent transmission of a telegraphic communication, is the one in reality with whom the contract is made. It does not necessarily follow that the contract is made with the person by whom, or in whose name a message is sent.

Telegraph companies, like common carriers, hold out to the public that they are ready and willing to transmit intelligence for any one upon the payment of their charges, and when paid for sending it, it forms no part of their business to inquire who is interested in, or who is to be benefitted by the intelligence conveyed.

A telegraph company who has been paid the whole compensation for transmission, irrespective of the question of contract, are liable in an action of negligence, to a party interested, for loss and damages in transmitting to him an *erroneous message*, though the error or mistake was made by *one of the companies through whom they transmitted it.*

As the business of telegraph companies is one which leads to their being intrusted with confidential and valuable information, especially in commercial matters, there are opportunities for frauds and abuses, which, in view of the relation that they occupy to the public makes it necessary, upon grounds of public policy, that they should be held to a more strict accountability than ordinary *bailees.* As the value of their service consists in the message intrusted to them being correctly and diligently transmitted, it must be taken for granted that they engage to do so; and if there is an unreasonable delay, or an error committed, it should be presumed that it has arisen from their negligence, unless they can show that it occurred from causes beyond their control.

Telegraph companies, like common carriers, may limit their liability by a special acceptance when the message is delivered to them—by a regulation making the *repetition of the message* necessary to insure its accurate transmission, but this regulation must be brought home to the knowledge of those who employ them, to exempt the company from liability.

Although a party who receives a telegraphic message in which he is interested, may discover small errors or mistakes which are apparent to him, but which is otherwise intelligible, it does not follow that he is bound to regard the whole message as unreliable and have it repeated at a large expense, to exonerate himself from the imputation of *negligence.*

In an action of negligence against the company, founded on an erroneous message transmitted by them, the *damages* must be the direct and immediate consequence of the negligence committed.

*General Term, March,* 1866.

*Before* DALY, *F. J.,* BRADY *and* CARDOZO, *Judges.*

THIS was an action brought against the defendants for damages for the incorrect transmission of a message sent from New York by the defendants' line, to the plaintiff in San Francisco.

The cause was tried before BRADY, J., and a jury, and a verdict rendered for the plaintiff. From this judgment the defendants appealed, to the general term.

De Rutte agt. The New York, &c., Telegraph Company.

THOMAS H. RODMAN, *for appellants.*
EDMUND R. ROBINSON, *for respondent.*

DALY, F. J.   The plaintiff was a commission merchant, doing business in San Francisco, California.   He had a brother, Theophilus De Rutte, who was his agent and correspondent at Bordeaux, in France, but who had otherwise no interest in the plaintiff's business.   T. De Rutte procured from Callardeu & Labourdette, bankers in Bordeaux, an order for the plaintiff to purchase for them a cargo of wheat in California, at the extreme limit of twenty-two francs the hectorolite, which is the French official measure for grain.   The plaintiff was to purchase and ship the grain to Callardeu & Labourdette immediately, his commission and the mode of his reimbursement to be the same as in a previous order which he had received from another Bordeaux firm, one of the partners in which was named Monod. Upon receiving the order Theophilus De Rutte prepared a telegram, in these words :   "Edward De Rutte, San Francisco.   Buy for Callardeu & Labourette, bankers, a ship load of five to six hundred tons white wheat, first quality, extreme limit twenty-two francs the hectorolite, landed at Bordeaux, same conditions as the Monod contract. Th. De Rutte," and inclosed it in a letter to Jules Lorrimer, a merchant of New York, with instructions to send it to the plaintiff in the quickest manner, and to debit the plaintiff with the charges. A clerk of Lorrimer copied the message upon a slip of paper, and took it to the telegraph office of the defendants, where he gave it to a clerk, to whom he paid $21.50 for its transmission to San Francisco. The defendants have printed blanks in their office, upon which messages are written containing a notice, that to guard against mistakes, every message of importance ought to be repeated, for which half the price will be charged, and that they will not be responsible for mistakes or delays in the transmission of unrepeated messages, from whatever

cause they may arise. It does not appear that any such blanks were used in this case, nor was it shown that Lorrimer's clerk or his principal knew of the regulation.

The defendants' line extends from New York to Buffalo, where it connects with other lines and a pony express to San Francisco. The message was transmitted correctly by the defendants' line and by the connecting lines to St. Louis, but when delivered to the plaintiff at San Francisco, there were several errors. Th. De Rutte was changed to Thos. De Rutte, Monod contract to monied contract, hectorolite to preterlitiere, and twenty-two to twenty-five francs.

The plaintiff was not misled as to three of the alterations. He understood the abbreviation Thos. to mean Theophilus, the words monied contract to mean Monod contract, and pretorlitiere to mean hectorolite. The words twenty-five francs, however, he assumed to be correct; but before acting upon the message, he tried, as he said, to get a copy of the dispatch from the telegraph company at San Francisco, but they stated that they could not furnish it. Grain could be purchased in San Francisco at that time at a price which would admit of its being landed at Bordeaux, charges included, at twenty-four to twenty-five francs the hectorolite, but not at twenty-two ; and the plaintiff accordingly purchased the requisite quantity, and chartered a vessel for its shipment to Bordeaux, when he received from New York, twenty days after the dispatch, the letter which his brother had written, advising him that the extreme limit was twenty-two instead of twenty-five francs. As a further assurance, on receiving this letter, he had the dispatch repeated, after which he sold the wheat at the cost price, less commission, storage and interest, and after several days effort, he succeeded in getting rid of the charter-party by the payment of $1,600 in gold, and he paid the wharfage of the vessel, and the brokerage fees upon the re-charter, making in all the sum of $2,004.51 fees upon the recharter; making in all, with the com-

NEW YORK PRACTICE REPORTS. 407

De Rutto agt. The New York, &c., Telegraph Company.

missions, storage and interest, the sum of $2,094.51, for which the plaintiff recovered judgment.

We are asked to reverse this judgment upon several grounds. The first ground taken by the defendants is, that their contract was to transmit the dispatch from New York to Buffalo, and deliver it there to the connecting line, which they did. That it is made their duty by statute laws of New York for 1844 (p. 395, § 11), to receive messages from and for other telegraph lines, and that where they transmit and deliver a message correctly to a connecting line, they are not answerable for errors occurring afterwards.

The duty which the statute imposes is as much for the benefit of the telegraph compa**l** as for the individuals who make use of them; for th**e** business of a company, where there are several connecting lines, might be materially diminished if any of them should refuse to deliver messages to, or to receive them from it, and the object of this provision, therefore, was manifestly to enable new companies to compete with established lines, thus preventing the evils of monopolies, and of combinations among companies. But while the statute makes it the duty of a telegraph company to receive and transmit such messages, it does not make it in such a case the collecting agent of the other lines. It imposes no higher duty than the words express, and leaves each company at liberty to require the payment of its own charges before it either delivers or transmits a message. Where a message is to be transmitted through many connecting lines, it is a matter of convenience to be enabled to pay the entire charge, either at the place from which it is sent, or at the place where it is received; and it is the interest of companies, especially where there are competing lines, to make arrangements whereby upon payment to them of the whole charge, a message may be sent the entire length of telegraphic communication. It is to be assumed that this is the case when a telegraph company is paid for the transmission of a mes-

sage to a place beyond their own lines, with which they are in communication by the agency of other companies, and they must in such a case be regarded as undertaking that the message will be transmitted and delivered at that place.

The same rule must be applied to them that is applied to a common carrier who receives the whole compensation for the carriage of a package addressed to a place beyond the limits of his own route; that is, that he engages for the due delivery of the package at the place of destination, unless he expressly limits his responsibility to his own route, or the circumstances are such as to clearly indicate that that was the understanding of the contracting parties. (*Weed* agt. *The Schenectady and Saratoga Railroad*, 19 *Wend.* 534; *Muschamp* agt. *The Lancaster and Preston Railway Company*, 8 *M. & Wels.* 421; *St. John* agt. *Van Santvoord*, 25 *Wend.* 660; *Id.* 6 *Hill*, 157, *in error*; *Wilcox* agt. *Parmlee*, 3 *Sandf. S. C. R.* 610.) By taking pay in advance for the whole distances, he holds himself out as a carrier for the entire distances (*per* WALWORTH, *C. in Van Santvoord* agt. *St. John*, *supra*). Where a railroad that terminated in Boston, took a wagon at Troy that was to be carried to Burlington, HARRIS, J., said: "It was no part of the plaintiff's business to inquire how many different corporations made up the entire line of road between Troy and Burlington, or having ascertained it, to determine at his peril which of such corporations had been guilty of the negligence" (*Fay* agt. *The Troy and Boston Railroad Company*, 24 *Barb.* 382), and Lord ABINJER, in *Muschamp* agt. *The Lancaster, &c. Railway* (*supra*), remarked, that it was useful and reasonable for the benefit of the public in such a case that it should be considered that the undertaking was to carry the parcel the whole way. "It is better," he said, "that those who undertake the carriage of parcels, for their mutual benefit, should arrange matters of this kind *inter se*, and should be taken each to have made the others their agents." All of

which remarks are as applicable to the transmission of a message as to the carriage of a parcel. In this case Lecour told the defendants' clerk to send the message to California, and asked him what would be the charge for sending it to San Francisco, to which the clerk answered $21.50, which Lecour paid, and this, *prima facie*, was sufficient to show that the defendants engaged to send it to San Francisco. Whatever contract was made was made with them, and not with any other company. There was nothing said, nor was there anything to indicate that they were to be answerable only for its correct transmission along their own line. They received the whole amount that was asked to send it to San Francisco, without communicating by what lines it would be sent, or any other particulars as to the mode or manner of its transmission. They took upon themselves the whole charge of sending it, and what arrangements were made, or what sum would be paid for the use of the lines in connection with them, were matters not disclosed to the party interested in the transmission of the message, and with which, consequently, he had nothing to do. He made his contract with them, and if injured by its non-fulfillment, he has a right to look to them for compensation for the injury sustained.

The next objection taken by the defendants is, that they entered into no contract with the plaintiff; that they made their contract with Th. De Rutte, who sent the message, acting as the agent of Callardeu & Labourdette. It does not necessarily follow that the contract is made with the person by whom, or in whose name a message is sent. He may have no interest in the subject matter of the message, but the party to whom it is addressed may be the only one interested in its correct or diligent transmission; and where that is the case, he is the one in reality with whom the contract is made. The business of transmitting messages by means of the electric telegraph, is like that of common carriers, in the nature of a public employment; for those

who engage in it do not undertake to transmit messages only for particular persons, but for the public generally. They hold out to the public that they are ready and willing to transmit intelligence for any one upon the payment of their charges, and when paid for sending it, it forms no part of their business to inquire who is interested in, or who is to be benefitted by the intelligence conveyed. That becomes material only where there has been a delay or a mistake in the transmission of a message, which has been productive of injury or damage to the person by whom, or for whom they were employed, and to that person they are responsible, whether he was the one who sent, or the one who was to receive the message. It is somewhat analogous to the question which arises when goods are lost upon their carriage, whether the action against the carrier is to be brought by the consignor or the consignee, and the general rule upon that subject is, that the one in whom the legal right to the property is vested is the one to bring the action; and if that is the consignee, the consignor in making the contract with the carrier, is regarded as having acted as the agent of the other. (*Danes* agt. *Peck*, 8 *T. R.* 330; *Griffith* agt. *Ingledew*, 8 *S. & Rawle*, 429; *Freeman* agt. *Birch*, 1 *Nev. & Man.* 420; *Dutton* agt. *Solomnson*, 3 *Bos. & Pull.* 584; *Everett* agt. *Salters*, 15 *Wend.* 474.) In the case now before us, it could make no difference to Collardeu & Labourdette whether the message was correctly transmitted or not, as wheat could not be purchased at the time in San Francisco at the price which they had fixed, and the plaintiff was the only one who could be, and who was affected injuriously by the mistake in the message. The error made led him into the purchase of over $17,000 worth of wheat, upon which he expected, upon the assumption that the dispatch was correct, to make his ordinary commissions, and the purchase proving unavailable when the mistake was discovered, he was subjected to an actual loss of more than two thousand dollars.

Th. De Rutte may, for certain purposes, be regarded as the agent of Collardeu & Labourdette in giving the order, but he was more especially the agent of the plaintiff in procuring it for him, and it is a decisive circumstance to show that he was acting for the plaintiff, and that the dispatch was sent upon his account and for his benefit, that Lorrimer, the correspondent in New York, was instructed by Theophilus De Rutte to charge the plaintiff with the expense of transmitting it. It was an order given to a commission merchant to purchase grain for a foreign house, if it could be bought at a certain price. In that event he had an interest to the extent of his commissions, and that he might have the earliest intelligence of it, and secure, if possible, any advantage to be derived from it, it was by the direction of his agent and correspondent at Bordeaux, and at his, the plaintiff's expense, sent by telegraph from New York to San Francisco. When the defendants, therefore, undertook and were paid for sending the message, their contract was with the plaintiff, through his agents, and the action for the breach of it was properly brought by him. (*Dryburg* agt. *The New York and Washington Telegraph Co.* 35 *Penn. R.* 298 ; *Eyre* agt. *Higbee,* 15 *How.* 46.)

But if we were to leave out of view altogether the question with whom the contract was made, the defendants would still be liable to the plaintiffs for putting him to loss, the damage through their negligence in transmitting to him an erroneous message, and as they were the company to whom the whole compensation for its transmission was paid, they would be liable in an action for negligence, though the error or mistake was made by one of the companies through whom they transmitted it. It has been frequently held that the owner of a vessel is liable for a collision resulting from negligence, though his vessel at the time was under the control of a pilot acting under an independent commission from the state, the reason given for which is, that it is more convenient and conformable to the

**412**          NEW YORK PRACTICE REPORTS.

De Rutte agt. The New York, &c., Telegraph Company.

general spirit of the law, that the owner, who has had the benefit of the voyage, should seek his remedy against the pilot, than that the injured party should be turned over to an action against the pilot, (*Yates* agt. *Brown*, 8 *Pick*. 23 ; 16 *Martins*, *La.* ; 4 *Dallas*, 206 ; *Fletcher* agt. *Broderip*, 5 *B. & P.* 182), and I think it may be said with equal force where a merchant in San Francisco receives a telegraphic message from New York, which leads him into a purchase involving inevitable pecuniary loss, which would not have occurred but for an error made in the transmission of the message, that he should not be compelled to seek through a chain of telegraphic communication extending over nearly the whole length and breadth of the United States, to ascertain where the error or mistake was made, but that it is more equitable and just to hold that the telegraph company to whom the message was originally given, and to whom the whole compensation for its transmission was paid, should be answerable to him for the negligence, and that having peculiar facilities, the obligation should be upon them to ascertain when, where and how the error occurred, leaving them to fix the ultimate responsibility upon those to whom it belongs. "Where a trust," said Lord HOLT, "is put in one person, and another whose interest is intrusted to him is damnified by the neglect of such as that person employs in the discharge of that trust, he shall answer for it to the party damnified" (*Lane* agt. *Cotton*, 12 *Mad.* 490). A trust was reposed in the defendants that they would send the message as it was delivered to them. They determined by what companies it should be sent beyond their line, and as the result has shown, the plaintiff had an interest in its correct transmission, which is sufficient to bring the case within this rule, which Lord HOLT laid down in an action on the case for negligence, and which, though expressed in a dissenting opinion, has been uniformly regarded as sound law.

The next question that arises is, as to the nature and

exact extent of the responsibility which the law should impose upon those who engage in the public business of transmitting intelligence from one place to another by means of the electric telegraph, whether considered with reference to their liability upon contract, or for injuries brought about by their negligence. The law upon this subject is as yet undefined, for the business is of recent origin, and the cases which have arisen are comparatively few. I have already pointed out one distinguishing feature, that though pursued for reward, it is designed for the general convenience of the public. Like the business of common carriers, the interests of the public are so largely incorporated with it, that it differs from ordinary bailments, which parties are at liberty to enter into or not, as they please. In this state it is made the duty of telegraph companies by statute to transmit dispatches from and for any individuals with impartiality and good faith, upon the payment of their usual charges (*Laws of New York*, 1848, *p.* 395), a duty which would arise from the nature of their business even if there were no statute upon the subject. Common carriers are held to the responsibility of insurers for the safe delivery of the property intrusted to their care, upon grounds of public policy, to prevent frauds or collusion with them, and because the owner having surrendered up the possession of his property, is generally unable to show how it was lost or injured. (*Riley* agt. *Horne*, 5 *Bing.* 217; *Thomas* agt. *The Boston and Providence Railroad Corporation*, 10 *Met. Mass.* 476; *Caggs* agt. *Bernard*, 1 *Ld. Ray.* 909 *and App.*) These reasons, which are the ones usually assigned for the extraordinary responsibility of common carriers, cannot be regarded as applicable to the same extent to telegraph companies; nor are there any reasons, in my judgment, why they should be held to the extent in any responsibility of insurers for the correct transmission and delivery of intelligence. As their business, however, is one which leads to their being intrusted

with confidential and valuable information, especially in commercial matters, there are opportunities for frauds and abuses, which in view of the relation that they occupy to the public, makes it necessary upon grounds of public policy, that they should be held to a more strict accountability than ordinary bailees.  As the value of their service consists in the message intrusted to them being correctly and diligently transmitted, it must be taken for granted that they engage to do so; and if there is an unreasonable delay, or an error committed, it should be presumed that · it has arisen from their negligence, unless they can show that it occurred from causes beyond their control.  It is particularly suggested by the counsel of the defendants, that the telegraph is not at all times subject to the will of the operator; that although the machinery and apparatus is in complete order, yet at times a message cannot be sent because of supervening influences, which at some point on the line unknown to the operator, destroys the affinity or other active qualities of the current as it passes along the wire.  The delicate touch of the battery may start the fluid, which by its passage is to transmit the agreed sign, but before it reaches its destination, a surcharged atmosphere, hundreds of miles away from the operator, may utterly destroy or materially vary the tractability of the conductor; the fluid may thus be diffused or varied in its practical operation, without the power of man to foresee or to prevent it.  Those who avail themselves of the advantages of the telegraph, can expect nothing more than it is in the power of this novel and useful invention to afford.  Causes like this, or any cause equally satisfactory, would absolve a telegraph company from all responsibility for errors or delays.  It is inevitable, moreover, that mistakes should be committed, even by the most skillful persons, in the interpreting, the transmitting and transcribing of words, and where the liability to do so is manifest, and the risk incurred is great, it is reasonable

NEW YORK PRACTICE REPORTS. **415**

De Rutte agt. The New York, &c., Telegraph Company.

that telegraph companies should have the right to require, as a test for their own security against loss, that a message should be repeated. Their compensation is small in proportion to the risk they incur, and they have the right to qualify their liability by a special contract that they will not be answerable unless that condition is complied with. Like common carriers, they may limit their liability by a special acceptance when the message is delivered to them, by requiring a repetition of it, but which must be brought home to the knowledge of those who employ them, who might otherwise be ignorant of the fact that a repetition of the message was necessary to insure its accurate transmission. It may be that in the course of time this practice will become so universally established among telegraph companies, that all doing business with them will be presumed to have a knowledge of it, and that the omission to secure a repetition of a message will be at the risk and peril of the party for whom it is sent.

That is not the case at present, and as there was nothing on the trial of this action to show that the clerk who delivered the message, or any one interested in it, knew of the establishment of such a regulation by the defendants, the ground of defence is not available to them.

The next ground taken is, that the plaintiff was himself at fault in not having the message repeated, after he had ascertained that there were three errors in it. That it was co-operating negligence on his part to act upon such a message, which deprives him of all right of action. He went to the office in San Francisco to ascertain exactly what dispatch they had received, but they could not find it, and I think that the errors he had discovered were not of a character which should have led him to doubt if the words "twenty-five," were correct. The change from Th. to Thos. was a very natural one. The mistake in a French word was one that might ordinarily occur, and the transformation of Monod, to the operator an unmeaning word,

into monied, was one of those slips or mistakes which might readily be made. That they were so, is apparent in the fact that he at once discovered them, and I think that it does not follow, because he discovered mistakes like these, that he was bound to regard the whole message as unreliable, and have it repeated at an expense of some forty dollars. The words "twenty-five," were intelligible and plain. They expressed the very price at which wheat was then ranging in San Francisco, and it was very natural for him to suppose that they had been transmitted correctly. To hold that he was guilty of negligence, because he assumed that the message was correct in this particular, would be to declare that no man must act upon one in which he discovers a few trivial mistakes, but which is otherwise perfectly intelligible, except at his peril. I do not profess to have much information upon the subject, but I apprehend that it is a matter of common and every-day experience for messages to be received with words misspelt or otherwise altered, without affecting their general sense, but with which they are perfectly intelligible, which the party receiving would have to disregard, or get repeated to be made secure in acting upon them, if the courts were to recognize such a rule as the defendants insist upon.

The last question in this case relates to the question of damages. The defendants claim that the loss which the plaintiff sustained in consequence of this erroneous message, was not one that can be regarded as fairly within the contemplation of the parties, or such as would naturally be expected to flow from the mistake that was made.

I dissented from the judgment of my brethren in *Bryant* agt. *The American Telegraph Company*, decided at the general term, 1866, in which they held a telegraph company responsible to the amount of $10,000 for a delay in the delivery of a telegraphic dispatch, by which the plaintiffs lost the opportunity of securing a debt of that amount by an attachment upon property of the value belonging to his

debtor, and so far as this court is concerned, that case is decisive of the point now presented. But this is a much stronger case than that. The order erroneously transmitted by the defendants' instrumentality to the plaintiff, was the direct cause of his purchasing the wheat at the price which he did, and of the outlay he made for its shipment; and the inevitable loss which resulted from his acting upon the supposed order, was the natural and necessary consequence of that purchase. The familiar rule in respect to damages is, that they must be such as flow directly and naturally from the non-fulfillment of the contract; that they must not be the remote but the proximate consequences of the breach; that they must be certain, and not speculative or contingent, and where the right of action is founded solely upon the ground of negligence, irrespective of any question of contract, that they must be the direct and immediate consequence of the negligence committed, and this case comes fully within this rule.

The judgment should be affirmed.