# SUPREME JUDICIAL COURT

#### FOR THE

## COUNTY OF BRISTOL, OCTOBER TERM 1866, AT TAUNTON.

---

PRESENT:

Hon. GEORGE T. BIGELOW, CHIEF JUSTICE.
Hon. EBENEZER R. HOAR,
Hon. REUBEN A. CHAPMAN, ⎫
Hon. HORACE GRAY, JR., ⎬ JUSTICES.
Hon. JOHN WELLS, ⎭

---

JONATHAN W. ELLIS *vs.* AMERICAN TELEGRAPH COMPANY.

In this commonwealth, telegraph companies may limit the measure of their liability to damages for errors in the transmission of messages, by reasonable rules and regulations, brought home to the knowledge of the parties interested therein.

If a message is received by a telegraph company for transmission from one point to another in this commonwealth, written upon a blank which contains, as a part of the terms and conditions upon which all messages are received by them for transmission, a statement that every important message should be repeated, by being sent back from the station at which it is to be received to the station from which it is originally sent, for which repetition half the usual price will be charged, and that they will not be responsible for any error in the transmission of any unrepeated message beyond the amount paid for sending the same, unless a special agreement for insuring the same be made in writing, and if an error occurs in transmitting the same, and the same is not asked to be repeated, and the message as erroneously transmitted is written upon a blank containing the same terms and conditions above referred to, and in that form is delivered to the person to whom it is addressed, such person so receiving the same cannot maintain an action against the company to recover greater damages than the amount paid for sending the same, without some further proof of carelessness or negligence on their part than that resulting simply from the error.

TORT against a telegraph company alleged to be " a corpora-tion established by law and having a place of business in New Bedford," to recover damages resulting from an error in the transmission of a message from Boston to the plaintiff in New Bedford.

At the trial in the superior court, before *Ames,* J., it appeared that the message was offered to the defendants by H. T. Meserve upon a printed blank, and was in the following form :

" American Telegraph Company. Terms and conditions on which this and all messages are received by this company for transmission. In order to guard against and correct as much as possible some of the errors arising from atmospheric and other causes appertaining to telegraphy, every important message should be repeated, by being sent back from the station at which it is to be received to the station from which it is orig-inally sent. Half the usual price will be charged for repeating the message, and while this company in good faith will endeavor to send messages correctly and promptly, it will not be respon-sible for errors or delays in the transmission or delivery, nor for the non-delivery of repeated messages, beyond two hundred times the sum paid for sending the message, unless a special agreement for insurance be made in writing, and the amount of risk specified on this agreement, and paid for at the time of send-ing the message. Nor will the company be responsible for any error or delay in the transmission or delivery, or for the non-delivery of any unrepeated message, beyond the amount paid for sending the same, unless in like manner specially insured, and amount of risk stated hereon, and paid for at the time. No liability is assumed for errors in cipher or obscurely written mes-sages ; nor is any liability assumed by this company for any error or neglect by any other company over whose lines this message may be sent to reach its destination, and this company is hereby made the agent of the sender of this message to for-ward it over the lines extending beyond those of this company. No agent or employee is allowed to vary these terms, or make any other or verbal agreement, nor any promise as to the time of performance, and no one but a superintendent is authorized

to make a special agreement for insurance. These terms apply through the whole course of this message on all lines by which it may be transmitted. E. S. Sanford, President. Cambridge Livingston, Secretary. 145 Broadway, N. Y.

" *Boston, Dec.* 29, 1864. Send the following message subject to the above conditions. To *J. W. Ellis, New Bedford. City Cambridge ten* (10) *men one hundred twenty-five dollars. H. T. Meserve.*"

Meserve paid only the ordinary rate for the transmission, without anything additional for repetition, or for insurance of its correct transmission. The message as delivered to the plaintiff was written upon a similar printed form, and the body of the message, as delivered, was as follows : " City Cambridge ten (10) men one hundred seventy-five (175) dollars." There was no evidence of carelessness or negligence, except the error in the sum, which was made by some agent of the company in transmission.

The defendants requested the court to instruct the jury that on these facts they were not liable. But the judge ruled that, notwithstanding the terms and conditions set forth in the printed heading of the message, the defendants were bound in transmitting the message to make use of ordinary care, attention and skill, and were liable for damages arising from inattention or carelessness in such transmission, either to the sender, or to the receiver, according to the nature of their respective interests in the message ; that if the sender had no interest in the message, or sustained no loss by its failure to be sent correctly, then the defendants would be liable to the plaintiff, as the receiver of the message, for any damage or loss sustained by him directly resulting from inattention or want of ordinary care and skill on their part, and not produced by any unexpected or unforeseen accident ; and that the fact that the message as delivered for transmission was an offer of $125 per man, and was actually delivered as an offer of $175 per man, was *prima facie* evidence of want of ordinary care, attention and skill on the part of the defendants.

The jury returned a verdict for the plaintiff, with $40 damages ; and the defendants alleged exceptions.

*G. Marston & L. T. Willcox,* for the defendants, in addition to some of the cases cited in the opinion, cited, as relating to telegraph companies, *Camp* v. *Western Union Telegraph Co.* 6 Amer. Law Reg. 443 ; *S. C.* Ib. 734.

*T. M. Stetson,* for the plaintiff. The party damaged by the delivery to him of an untrue and deceptive message, the untruth of which is caused by the company's carelessness, has an action for the tort. *New York & Washington Telegraph Co.* v. *Dryburg,* 35 Penn. State R. 298. The plaintiff does not bring an action of contract ; but the defendants have done to him something which has injured him. He has been deceived, to his injury, by the defendants. Suppose he received a despatch from Chicago, saying, " Come on at once ; " and went accordingly ; and on arriving there found either that the message as delivered to the company was, " Do not come on at once," or that no message at all had been delivered to them.

The plaintiff's rights do not depend on whether the sender was injured. The plaintiff has nothing to do with the terms of the contract between Meserve and the defendants. Those are the terms on which messages are " received." The defendants provide for a contract of insurance, which no one but a superintendent can make ; and there are no superintendents known in this state. The plaintiff did not know whether this was a a repeated message or not. It was delivered to him as a duplicate of the message received by the defendants. If they intended the printed terms and conditions on which messages are " received " by them to operate as a notice to the plaintiff, they should have said so. But they said nothing of the kind. The defendants were public common carriers of messages. *Parks* v. *Alta California Telegraph Co.* 13 California, 422.

There is no such thing as taking pay to insure one's own ordinary care. Special agreements do not relieve against one's own negligence. This is familiar law. In this case, a great error was made in the words, and no attempt was made by the company to show that it was due to atmospheric or chemical agencies.

BIGELOW, C. J. These exceptions open an inquiry into the nature and extent of the duties and liabilities which are assumed

by those who are engaged in carrying on the business within this commonwealth of sending messages by means of the electric telegraph. It appears to have been taken for granted at the trial of the case, as it certainly was in the arguments of learned counsel at the bar of this court, that the rights of the parties were to be determined solely by having recourse to the rules and principles of the common law. This we think is an error. We entertain no doubt that these would have been found fully adequate to the satisfactory solution of the various questions to which the pursuit of this novel branch of human skill and industry will in the course of time necessarily give rise. But the legislature of this commonwealth have not deemed it wise or expedient to leave to the slow progress of judicial determination the regulation of a business on which so many of the daily transactions of life, involving the most important rights and interests, are made to depend. By Gen. Sts. *c.* 64, provisions are made by which the general powers of "telegraph companies" are limited and defined, and their duties to a certain extent are prescribed and regulated. By § 13 of that chapter it is enacted that "owners and associations engaged in the business of telegraphing for the public by electricity, although not incorporated, shall be subject to the liabilities and governed by the provisions of this chapter, in the same manner as corporations." The defendants being a foreign corporation, established under the laws of another state, they likewise clearly come within the purview of this enactment. The true construction of the provision is, that owners of lines of telegraph not incorporated by the laws of this state, but transacting business within it, whether incorporated elsewhere or not, are to be subject to the same duties and liabilities as domestic corporations. It certainly could not have been the intention of the legislature, while prescribing the powers, rights and duties of individuals, and of corporations established under the laws of this state, in the management and control of a particular kind of business carried on here, to leave the door open to foreign corporations to conduct the same kind of business within the Commonwealth without any restriction or limitation, and subject to no requirements by which to secure

a faithful and honest performance of the service which they undertake to render to the public. Any doubt, however, concerning the interpretation of the above cited provision of the statute is set at rest by a recurrence to the previously existing statute on the subject, of which Gen. Sts. *c.* 64 is a substantial reënactment, with such changes only as the commissioners on the revision of the statutes deemed necessary for the sake of brevity and comprehensiveness. By *St.* 1849, *c.* 93, it was provided that " every owner or association engaged in telegraphing for the public, by electricity, in this state " should be subject to the same duties, restrictions and liabilities as companies incorporated within the Commonwealth. This language is broad enough, and was manifestly intended to include all persons and bodies corporate of every description engaged in the business of transmitting messages by telegraph in this state. There can be no doubt, therefore, that foreign corporations of this class are put on the same footing, as to their rights, privileges and responsibilities, as domestic corporations chartered for similar purposes.

We are then to look into the provisions of the statute to ascertain how far they regulate and control the relative rights and liabilities of the parties to this suit. The only important clause bearing on the questions saved by the exceptions is found in the tenth section of the chapter of the General Statutes already cited. It is in these words : " Every company shall receive despatches from and for other telegraph lines, companies and associations, and from and for any person ; and, on payment of the usual charges for transmitting despatches according to the regulations of the company, shall transmit the same faithfully and impartially." The leading feature in this enactment is, that it in effect takes the business of conducting and managing a line of electric telegraph within this commonwealth out of the class of ordinary private occupations, and makes it a *quasi* public employment, to be carried on with a view to the general benefit and for the accommodation of the community, and not merely for private emolument and advantage. Under this provision, an owner or manager of such a line becomes to

a certain extent a public servant or agent. He is bound, under a heavy penalty, to the due and faithful execution of the service which he holds himself out as ready to perform. He cannot refuse to receive and forward despatches; nor can he select the persons for whom he will act. He cannot transmit messages at such times or in such order as he may deem expedient. He is required to send them for every person who may apply, at a usual or uniform tariff or rate, without any undue preference, and according to established regulations applicable to all alike. There can be no doubt that, in view of the nature of the business, these requisitions are just and expedient. They certainly tend to prevent monopoly and exclusive privileges, and to secure to the public an equal enjoyment of the benefits arising from this new method of intercommunication between distant points. In some respects, they assimilate the duties and obligations incident to the employment to those which the law attaches to that of common carriers. But it is a mistake to say that the extent or degree of responsibility is the same. There is nothing in the statute which gives countenance to the suggestion, urged by the plaintiff's counsel, that owners or conductors of telegraphs are bound to warrant or insure the correct transmission of the messages which they undertake to send. Nor would it be just or reasonable to hold them to such a standard of diligence. The reasons of policy and expediency on which the rule of the common law is founded, which imposes on carriers of goods a liability for all losses not caused by the act of God or the public enemy, do not apply to the business of transmitting messages by means of the electric telegraph. Carriers are intrusted with the manual possession of the property committed to their care. While in their custody it is wholly out of the control and supervision of its owner. The identity of the article which they received with that which they delivered cannot be mistaken. By the use of a proper degree of diligence and care, such as is necessary to the safety of the goods in their charge, they can guard against their loss arising from any cause except such as from the nature of things are beyond their control while the danger of fraud and the opportunity for its practice

by those who have the exclusive and absolute custody and control of property for carriage render it expedient and necessary to hold them to the strictest accountability for its safe transportation and delivery.

But the trust reposed in the owner or conductor of a line of telegraph is of a very different character. No property is committed to his hands. He has no opportunity to violate his trust by his own acts of embezzlement, or by his carelessness to suffer others by means of larceny or fraud to despoil his bailors of their property. Nor can it be at all times in the power of an operator, however careful or skilful he may be, to transmit with promptness or accuracy the messages committed to him. The unforeseen disarrangement of electrical apparatus; a breach in the line of communication at an intermediate point not immediately accessible, occasioned by accident or by wantonness or malice; the imperfection necessarily incident to the transmission of signs or sounds by electricity, which sometimes renders it difficult if not impossible to distinguish between words of like sound or orthography, but different signification : these and other similar causes, the effect of which the highest degree of care could not prevent, make it impracticable to guard against errors and delays in sending messages to distant points. To these hindrances and embarrassments in the conduct and management of the business are to be added the mistakes and misapprehensions which will unavoidably take place, however vigilant and careful the operator may be, in reading and correctly understanding the messages to be sent and in interpreting them at the point of their reception, as they are transmitted by the arbitrary signs or sounds which are the substitute for the written or spoken words. It would be manifestly unreasonable and unjust to annex to a business of such a nature the liability of a common carrier, or to require that those engaged in it should assume the risk of loss and damage arising from causes, the operation of which they could neither prevent nor control.

But although they ought not to be held to such a standard of diligence, they are not exempt from all responsibility for a want of fidelity and care in the exercise of the employment which

they undertake to carry on. There can be no doubt that, in the ordinary employments and occupations of life, men are bound to the use of due and reasonable care, and are liable for the consequences of carelessness or negligence in the conduct of their business to those sustaining loss or damage thereby. We can see no reason why this rule is not applicable to the business of transmitting messages by telegraph. But the rule does not operate so as to prevent parties from prescribing reasonable rules and regulations for the management of the business, or establishing special stipulations for the performance of service which, if made known to those with whom they deal, and directly or by implication assented to by them, will operate to abridge their general liability at common law, and to protect them from being held responsible for unusual or peculiar hazards which are incident to particular kinds of business. Of course, a party cannot in such way protect himself against the consequences of his own fraud or gross negligence, or the fraud or gross negligence of his servants or agents. Nor can he escape all liability or responsibility in the performance of the service or duty which he undertakes. But he may to a certain extent, in the mode above indicated, limit the extent of his liability, or graduate the amount of his compensation, according to the risk which he assumes, as well as by the nature of the service which he renders. It is upon this ground that it is held that a common carrier, although by the rules of law he is an insurer of the property intrusted to him, may regulate the extent of his liability by a notice, brought home to his employer and assented to by him, either directly or by implication. *Judson* v. *Western Railroad,* 6 Allen, 486, 490. This principle is especially applicable to an employment such as is carried on by the defendants, which is in its nature a public one, and which the party undertaking it is bound to exercise for every one who may seek his services, however onerous or hazardous may be the particular duty or labor which he is called on to perform.

Nor can there be any difficulty or danger in the application of this principle, so long as it is kept within a proper limit. That limit is found by requiring in all cases that the conditions

and regulations by which a party seeks to limit his liability in the conduct of his business shall be reasonable. Such only, by the rules of law, can a party be permitted to prescribe, and to none other can those who deal with him be held to yield their assent.

But we need not have recourse to these familiar and well settled principles of the common law, in order to establish the right of the owners and conductors of telegraphs to make rules and regulations by which to define and limit their duties and obligations in the transaction of the business which they assume to carry on. This right is clearly recognized and affirmed by the statute already cited. By that, corporations, associations and individual owners of lines of telegraph, doing business within this commonwealth, are only required to transmit despatches "according to the regulations" which they may establish. It is hardly necessary to say that this provision does not confer the right to impose such conditions or restrictions in the mode of conducting the business as the self-interest or caprice of owners and conductors of telegraphs may dictate; but only those which are reasonable and proper, in view of the nature of the business, and the risks and responsibilities which it involves, and the necessity of securing to the public due opportunities for a fair and reasonable use of the telegraph, as well as of affording due protection to the rights of those on whom are imposed the duty and burden of conducting the business for public accommodation. This is the true interpretation of the statute; any other construction would lead to the result that the legislature conferred a power to establish unreasonable regulations for the conduct of a business of a *quasi* public nature, a conclusion which is manifestly absurd.

We are then brought to the real question on which the decision of this case must depend; and that is, whether the rule on which the defendants relied in defence of the plaintiff's claims is a just and reasonable one, such as they had a right to prescribe, and by which the plaintiff was bound in the reception of the message which they transmitted to him. Upon this point we can entertain no doubt. We are not called on in this case to

determine whether all the conditions and stipulations are valid and binding which were set forth in the printed paper on which the message was written by the sender, and which were also inserted in that on which the message was transcribed at the point of its reception, and which was delivered to the plaintiff. The sole question here is, whether that portion of the terms and conditions prescribed by the defendants is reasonable and valid, which provides that the defendants will not hold themselves responsible for errors and delays in the transmission and delivery of messages, unless they are repeated; that is, sent back from the station at which they are received to that at which they were originally sent, with a payment for such repetition of half the usual price for transmission. In view of the risks and uncertainties attendant on the transmission of messages by means of electricity, and the difficulties in the way of guarding against errors and delays in the performance of such a service, which have been already alluded to, and also of the very extensive liability to damages which may be incurred by a failure to deliver a message accurately, we think it just and reasonable that the conductor of a telegraph should require that additional precautions should be taken to ascertain the accuracy of the messages as received, at the request and expense of the parties interested, if they intend to hold him responsible in damages for any mistake which may have taken place in the transmission of the messages. There is nothing in this regulation which tends to embarrass or hinder the free use of the telegraph, or to impose on those having occasion to transmit or receive messages any onerous or impracticable duty. The repetition of a message may be unimportant. A mistake in its transmission might occasion no serious damage or inconvenience to the parties interested. Whether it would do so or not would be within the knowledge of the sender or receiver, rather than within that of the operator who transmitted it. The latter could rarely be expected to know what would be the consequences of an error in its transmission. It is therefore a most reasonable requisition that it should be left to those who know the occasion and the subject of the message, and who can best judge of the consequences attendant upon

any mistake in sending it, to determine whether it is of a nature to render a repetition necessary to ascertain its accuracy, instead of throwing this burden on the owner or conductor of the telegraph, who cannot be supposed to know the effect of a mistake, or the consequences in damages of a failure to transmit it correctly.

Nor can we see any good reason why, on similar grounds, it would not be a just and proper exercise of the right to establish regulations for the conduct of such business to require that persons transmitting or receiving messages should make known the extent and nature of the risk to be assumed by the conductor or owner of the telegraph, if, in case of failure to transmit them accurately, a pecuniary loss would be involved, for which he might be held liable. By no other means could they be certain of obtaining a compensation proportionate to the risk to be assumed, or an opportunity of exercising unusual diligence to protect themselves against the chances of mistake or miscarriage.

It is mainly for these reasons that we are of opinion that the instructions given to the jury at the trial of this case cannot be supported. The defendants were entitled to insist on a compliance with that part of their regulations which required that the message should be repeated, and that the extent of the risk should be made known to them, if they were to be held to insure the safe and correct transmission of the message, or, in case of failure, to be responsible for all the damages consequent on delays or errors. Of this regulation the plaintiff had notice. Although he entered into no express contract with the defendants, and cannot be held to have made any special stipulations with them by which he is bound, he did consent to receive at their hands a message which he alleges it was their duty to deliver to him. It is on this undertaking by the defendants, and for the breach of duty of which he alleges they are guilty, that he seeks to hold them in this action. It may, therefore, be a sufficient answer to such a claim, that, according to the reasonable regulations by which they were governed in the performance of their undertaking towards the plaintiff, and of which he

had notice, they have committed no breach of duty for which they can be held liable to him.

Besides; it is difficult to see how the plaintiff, who claims through the contract entered into by the sender of the message with the defendants, which created the duty and obligation resting on the defendants, can claim any higher or different degree of diligence than that which was stipulated for by the parties to the contract. Certainly a derivative or incidental right cannot be greater or more extensive than that which attached to the principal or source whence such right accrued or was derived.

It is hardly necessary to say that the question whether the mistake or error in the despatch would have been prevented or corrected by the repetition of the message, in conformity to the regulations established by the defendants, does not appear to have arisen at the trial. Whether it would have done so or not was a question of fact for the jury. Of course, the defendants would be liable for any negligence causing damage, which would not have been prevented by a compliance with these rules.

In the examination of this case we have not derived any great aid from the cases cited at the bar. The one on which the plaintiff mainly relied, *New York & Washington Telegraph Co.* v. *Dryburg*, 35 Penn. State R. 298, differs from this in the essential particular that it was not proved that the defendant in error had any notice or knowledge of the regulations of the company, by which their liability was restricted. The best considered cases seem to be *M'Andrew* v. *The Electric Telegraph*, 33 Eng. Law & Eq. R. 180 ; *Birney* v. *New York & Washington Telegraph Co.* 18 Maryland, 341, and *De Rutte* v. *New York, &c. Telegraph Co.* 1 Daly, 547.

The result is, that the exceptions must be sustained, and a

*New trial granted.*