NEW YORK—NOVEMBER, 1873.        527

The Atlantic and Pacific Telegraph Co. v. The Western Union Telegraph Co.

## The Atlantic and Pacific Telegraph Co. v. The Western Union Telegraph Co. et al.

Plaintiffs and defendants were the owners of parallel and competing telegraph lines between Cleveland, Ohio, and New York, and the defendants also controlled and managed, partly as owners and partly as lessees, a line from New York to Plaister Cove, in Nova Scotia, at which place their lines connected with certain foreign ones, making a chain of telegraphic connection between this country and Europe; *Held*, that the plaintiffs were not, within the meaning of the statutory provision, to be regarded as owners of parallel and competing lines between New York and Plaister Cove in Nova Scotia, so as to authorize defendants to refuse to receive from them, at New York, messages to be transmitted along that line, directed to Europe.

Where defendants were engaged in the business of transmitting telegraph messages from New York to Europe; *Held*, that it was not unreasonable for them to require, where they receive dispatches in New York from other companies for transmission to Europe, that there should be attached to the telegram the date at which it was received by them in New York, and the name of the company from whom it came, so that the date at New York and the name of the company might be attached to and form a part of the dispatch in its transmission to Europe, nor that they should make an extra charge for this addition to the dispatch.

A regulation of the defendants required when such messages were received from other companies at New York for transmission along the defendants' line to Nova Scotia for Europe, that a power of attorney from the sender of the message should in each case be produced to the defendants, authorizing them to send the message, or it would be refused. *Held*, that the regulation was unreasonable, as it was imposing upon other companies what was practically impossible in the due and speedy transmission of messages along their lines for Europe ; was manifestly enacted to give the defendants along their parallel lines the monopoly of all such messages, and if permitted, would defeat the provision of the statute, which enacts that every company in this State must receive and transmit a dispatch from another company, which is from or to an individual, unless in the case specially excepted.

Special Term, *November*, 1873.

Motion to vacate an injunction.

This action was brought against the Western Union Telegraph Company, the Anglo-American Telegraph Company Limited, and Le Société du Cable Transatlantique Français Limité, to compel them to receive and transmit messages tendered to them by the plaintiffs. The statutory provision upon which the plaintiffs based their action is as follows : " It shall

be the duty of the owner or the association owning any telegraph line doing business within this State, to receive dispatches from and for other telegraph lines and associations, and from and for any individual, and on payment of their usual charges for individuals for transmitting dispatches as established by the rules and regulations of such telegraph line, to transmit the same with impartiality and good faith, under the penalty of one hundred dollars for every neglect or refusal so to do, to be recovered, with costs of suit, in the name and for the benefit of the person or persons sending or desiring to send such dispatch ; provided that nothing contained in this section shall be construed to require any telegraph company or association to receive and transmit dispatches from or for any other company or association owning a line of telegraph parallel with or doing business in competition with the line over which the dispatch is required to be sent " (Laws of 1848, ch. 265, amended by Laws of 1855, ch. 559, 3 Edmonds' Statutes at Large, 722, § 11).

An injunction order restraining them from refusing to receive and transmit the messages tendered to them by the plaintiffs was obtained upon affidavits and the verified complaint, which set forth that the plaintiffs owned and operated a telegraph line extending from New York city, through Cleveland, to Chicago, and by means of contracts made with divers parties managed and operated other lines, extending from Chicago, through Virginia City in Nevada, to San Francisco. That the Western Union Telegraph Company were doing business in New York city, and were engaged in the management and operation of telegraph lines extending from New York to Brest, in France, and Valentia Bay, in Great Britain ; and owned that part of said lines extending from New York to Duxbury, in Massachusetts, and Plaister Cove, in Canada. That these telegraph lines connected at their termini in Europe with other lines extending to Munich, in Bavaria, and to the city of Cintinje, in Montenegro. That on August 9th, 1871, the plaintiffs tendered to the Western Union Telegraph Company, for transmission, two messages, one addressed to Prince Nicholas Petrovitch, Cintinje, Montenegro, and the other to A. Bichlmaier, Munich, Bavaria. These messages were written

on the printed forms furnished by the defendants. The first of these messages was received by the plaintiffs, at their office in Cleveland, Ohio; and the second, at their office at Virginia City, Nevada; and the senders of each requested and authorized the plaintiffs to transmit the same by their line to New York, and there to deliver the same to the Western Union Telegraph Company, for transmission to the terminus of the Atlantic Cable, in Europe, from whence it might be forwarded to its destination.

Under each of the messages was written: " To Cable Company, New York. This is handed to you by me for the A. & P. Telg. Co., 11 Broad St., New York, as agent for the sender. A. W. SMITH, Mangr., Delivery Dept., 11 Broad St., New York."

That with the messages were tendered the usual rates for their transmission, but the Western Union Co. refused to receive or transmit them, and notified the plaintiffs that they would not receive for transmission or transmit any messages from the plaintiffs, unless the plaintiffs would produce in each case a power of attorney from the sender of each message authorizing the defendants to receive and transmit the same. That it was practically impossible for the plaintiffs to transmit any messages under such conditions, and that the defendants' object was to injure the business of the plaintiffs, and obtain a monopoly of business for the defendants, who had a telegraph line extending westerly from New York which competed with plaintiffs' line.

An injunction order was obtained, enjoining the defendants "from refusing to receive and transmit to their respective termini, and there to deliver to the next connecting telegraph company, any and all telegraphic messages which shall be delivered to them, or either of them, by the plaintiff or its agents, for transmission to Europe, or any city or town therein accessible by telegraphic communication, and that they transmit the same in the order in which they are received with impartiality and good faith—provided the plaintiffs shall, upon tendering such messages for transmission, pay to the person authorized to receive European or cable messages such compensation therefor as is required by the defendants, or either of them, for

similar messages from persons other than the plaintiff, and shall tender the same within the usual hours of business."

The nature of the affidavits used on the motion to vacate the injunction order, and those used in reply, appear by the opinion.

*Grosvenor P. Lowrey*, for the motion.

*Everett P. Wheeler*, opposed.

DALY, CH. J.—The statute makes it obligatory upon any telegraph company doing business in this State to receive dispatches from other telegraph lines or associations, which are from or for any individual, upon the payment to said company of its *usual* charges, and it requires the company to transmit the dispatch with impartiality and good faith, exempting it, however, from any obligation to receive or transmit dispatches from or for any company owning a line of telegraph parallel with, or doing business in competition with, the line over which the dispatch is required to be sent (3 Edmund's N. Y. Statutes at Large, p. 722, § 11).

The defendants insist that they were under no obligation to receive and transmit the dispatches sent to them by the plaintiffs, upon the ground that the plaintiffs are the owners of a line coming within the meaning of this last provision of the statute. The plaintiffs are owners of parallel and competing lines with the telegraph line of the defendants between Virginia city, Nevada, and the city of New York, and Cleveland, Ohio, and the city of New York—these two western cities being the points from which the plaintiffs transmitted the messages which the defendants refused to receive from them at New York for transmission to Europe. The defendants claim, also, that the plaintiffs are the owners of a competing line from New York to Boston ; but this the plaintiffs deny, and I shall, therefore, treat this as disproved.

The defendants are the owners of a line from the city of New York to Duxbury, in Massachusetts, and the owners in part and lessees in part of lines from the said city to Plaister Cove, in Nova Scotia, from which places said lines connect

with certain foreign companies, making a chain of telegraphic connection between this country and Europe. They admit that over these lines they receive dispatches for Europe, which they deliver, at their termini, to the connecting European lines. With the lines which the defendants operate between the city of New York and their termini in Massachusetts, and at Plaister Cove, Nova Scotia, the plaintiffs have no parallel or competing lines, and it is over these lines that the plaintiffs required the dispatches to be sent, which the defendants refused to receive.

The defendants insist that, because the plaintiffs are owners of lines parallel to and competing with their lines, as far as the city of New York, that they, the defendants, are not obliged to take the messages which the plaintiffs send to them in New York, and transmit them over the lines which the defendants operate from New York to Plaister Cove, in Nova Scotia, or to Duxbury. They claim that they are excused from so doing by the statute, which, they insist, means a line competing with them on any part of the route over which a message is sent. One of the messages sent by the plaintiffs was transmitted by the plaintiffs from Nevada to New York, its ultimate destination being Montenegro, in Europe, and the ground taken by the defendants is, that as the plaintiffs were a competing line in the transmission of this message from Nevada to New York, the defendants were, by the statute, excused from taking it at New York, and sending it over their line on the way to its destination. No such construction as this is warranted by the statute. There is no difficulty in the interpretation of its meaning. It says, " the line over which the dispatch *is required to be sent*," and in this case that line was either the one extending from New York to Duxbury, or the one from New York to Plaister Cove—routes operated exclusively by the defendants. So far as respects the defendants, it was not the sender of the dispatch, but the plaintiffs, by whom it had been transmitted to New York, that required the defendants to transmit it further, and the route over which the plaintiffs required it to be sent was one where they had no parallel or competing lines. As a telegraph company, they had the right, by statute, to require the defendants to receive and transmit a dispatch, unless they were themselves the owners of parallel or compet-

ing lines on the route over which they required it to be sent, and this was not the case.

The ground thus disposed of, at least so far as this motion is concerned, was taken upon the argument; but it was not the ground upon which the defendants refused to receive the dispatches when presented to them. They refused to receive any messages from the plaintiffs for transmission along their line, unless the plaintiffs would produce in each case a power of attorney from the sender of each message, authorizing the defendants to receive and transmit it. This was imposing what was practically impossible in the due and speedy transmission by the plaintiffs of a telegraphic dispatch which was to go to Europe; for to carry out such a regulation as this, the dispatch, when received at New York, would have to be kept there until the plaintiffs could in each case receive the power of attorney by mail. If the defendants could do this, they could wholly defeat the statute, which has declared that they must receive and transmit a dispatch from another telegraph company, which is from or to an individual, unless in the case specially excepted; for the defendants being the owners of competing lines over a large breadth of this continent, no other company could transmit a message from New York for Europe, by routes also used by the defendants, without a delay in each case at New York, which would compel the company to abandon the business, and leave the whole of it to the defendants. It is not necessary to consider how the public might be affected by thus cutting off all competition in the transmission of European messages, so far as their transit in the United States is involved. It is sufficient that a statute of this State has made it obligatory upon any company doing business here, to receive and transmit dispatches from and of other companies, and that the condition which the defendants wish to add to this statutory regulation would render it wholly nugatory.

The defendants state in their affidavit that before the 9th of August, 1871, the day when they refused to receive the messages, they had adopted a regulation which was then in force. It is in these words: "Whenever messages which have come over the line of any other telegraph company are offered by such company for transmission, the person presenting the

message must be required to paste it or write it on one of the No. 2 blanks of this company, under the printed conditions, and sign his name for the company he represents under the line, ' Send the following message subject to the above terms, which are agreed to.' " This, it would seem from the dispatches which are annexed to the complaint, the plaintiffs substantially complied with, for each dispatch is signed, in the manner provided for, by the managing agent of the plaintiffs as their representative.

The defendants aver, on information and belief, that they refused these dispatches because they had not written upon them the names of the places from which each dispatch was sent, which statement the plaintiffs, upon information and belief, deny; and as the defendants have not, after this denial, which is quite as good as the defendants' assertion, furnished any positive evidence of what occurred at the time when the two messages were presented and refused, this statement will be treated as not established.

The defendants also aver in their affidavits upon this matter, that these messages were refused for the reason that they were not authenticated as being veritable messages of the persons whose names purported to be signed by them; that it was known to and stated by the agent of the plaintiffs that the messages presented were not the original messages said to have been transmitted from distant places to the city of New York over the plaintiffs' lines, but were written off in the said city by the plaintiffs' agent. This is to be taken in connection with the plaintiffs' statement in their complaint and affidavits, that the messages were refused unless the plaintiffs produced a power of attorney in each case from the person sending the message, showing that the plaintiffs had authority to transmit it, which I have assumed to have been one of the grounds taken by the defendants when the dispatches were presented for transmission. I have already expressed my views upon the unreasonableness of such a condition, in addition to which it is averred in the plaintiffs' affidavits, and not denied by the defendants, that it has never been the custom of any telegraph company in this country to require the autograph signature of the sender to be affixed to the telegram handed to it for trans-

mission; that the larger number of telegrams sent are signed in the handwriting of some other person than the one whose name is subscribed, and that a still larger proportion are not delivered to telegraph companies by the person whose name is subscribed, but by some other person employed or authorized by him. The truth of this statement, I may assume from the defendants' silence, is too notorious to be questioned by them, and it shows that what is exacted of the plaintiffs is unusual, and opposed to a widespread and general custom. Whether the defendants impose such a condition upon other telegraph companies also, does not appear; but the plaintiffs aver, and the defendants do not deny it, that the defendants do not and never have required the signatures of individuals delivering telegrams to it to be authenticated in any way, nor that the name subscribed should be the autograph signature, nor that the telegram should be delivered by the person whose name is subscribed to it. The defendants aver that it has always been their custom to require messages to have appended to them the signature of the person sending the same; but I do not understand this as averring that they require the autograph signature or satisfactory proof, in each instance, that the telegram presented for transmission was signed by the person whose name is subscribed to it, or by some one by his authority.

The defendants aver that they are advised that they cannot with safety accept messages for transmission from any person known to them not to be the ostensible author thereof without incurring personal liability to the receiver for any fraud, misstatement, deceit, or damage arising out of the transmission of such message, and that for that reason it is necessary that every message should be signed, and the signature communicated to the receiver; that it has always been their custom to require that the name of the place from which the message is sent should be upon the telegram, as well as the signature of the person sending it. In this connection my attention is called to the decision of the Court of Appeals in *Elwood* v. *The Western Union Telegraph Co.* (45 N. Y. 549), by which the defendants had to pay a very heavy amount in damages for negligently sending a message in the name of the cashier of a bank at the request of a party who was held out by the

message as entitled to credit at the bank for a very large amount.

The decision in that case furnishes no ground for exacting from the plaintiffs in all cases proof of their authority to have the message sent which they offer to the defendants for transmission. The point decided by the Court of Appeals was this: the defendants transmitted and delivered to the plaintiff in that action at Pithole, Pa., a dispatch purporting to come from the Keystone Bank at Erie, Pa., stating that it would pay the checks of T. F. McCarthy for $20,000. The plaintiff, after receiving the message, took it to the operator at Pithole, and told him to send to the Keystone Bank at Erie, Pa., and get the name of the president or of the cashier to the message. The operator said that it was the fault of the office at Titusville, Pa., that he would send there, and get the name of the officer of the bank. He sent to Titusville, and in the afternoon of the same day a message was received at Pithole, purporting to come from Erie, and to have been forwarded from Titusville, giving, as annexed to the message, the name of the cashier of the bank, which was delivered by the defendants to the plaintiff, who, after the receipt of it, paid McCarthy $10,000. The whole transaction was fraudulent and a forgery. No such message was received at Titusville from the bank at Erie. Both messages were written by McCarthy at the defendant's office at Titusville. The operators there knew that they were written there by him, McCarthy being known to them by name; a most material point being that they knew that no such message as the second one had been sent from Erie for transmission to Pithole. The jury found upon the evidence that the second message, through which the money was obtained from the plaintiff, was sent, under these circumstances, by the defendants' operators at Titusville to Pithole,—that is, sent as purporting to have come from Erie, when they knew that no such message had been sent from Erie. The jury having found this to be the fact, the court decided that the act was one of gross negligence, through the instrumentality of which McCarthy was enabled to succeed in getting the money, and that the defendants therefore should be responsible for the loss of it by the plaintiff. They were held liable for the act of their agents in

falsely forwarding so important a message as this from Titusville, as one coming from Erie, and doing it without any evidence that McCarthy, a person then in Titusville, had authority to send from there a message as coming from a bank in another place, declaring, on the part of the bank, that he had a credit at the bank to the large amount of $20,000. It required no regulation in respect to the receipt of messages, or the genuineness of the signatures attached to them, to guard against such an act as this. If they had forwarded the message as they received it at Titusville,—that is, as one coming from Titusville, and not from Erie,—no injury would have arisen, or if it had, they would not have been answerable for it; or if they or their agent had done what the banker at Pithole required, sent the message he requested to the bank at Erie, the bank would no doubt have telegraphed in reply that they had sent no such message to their correspondent at Pithole, and that McCarthy had no authority to draw checks upon them for $20,000. It was the defendants, or rather their agents, sending a message which they knew to be false;—sending it as a message telegraphically received that day from Erie, and forwarded by them from Titusville;—that made the defendants responsible; an act of negligence so great as almost to warrant the suspicion (in view of the importance of the message and of its object) that it could not and would not have been done unless by an agent of the defendants, who knowingly co-operated with McCarthy to effect the consummation of his fraudulent scheme.

The regulation which the defendants aver they adopted in respect to telegraphic dispatches received by them from other companies, was not incorporated in the printed blanks which contain the conditions upon which the defendants agreed to transmit messages, and the defendants aver that they never heard of such a regulation until after the granting of the injunction in this suit; that they had no notice of any rules or regulations of the defendants for the transmission of messages other than those contained upon the printed blanks furnished by the defendants for cable messages; that the defendants, after their refusal to transmit the two messages referred to, offered to transmit telegrams for Europe for the plaintiffs, if the plaintiffs

would send them as messages sent from New York by the plaintiffs for the persons to whom they were addressed, which the plaintiffs say would subject them (by the defendants' rules) to an extra charge for transmitting the date at New York, and the plaintiffs' name, amounting to one dollar in gold, upon each message sent to England, with a proportional increase for sending one to more distant places in Europe, the practical effect of which, the plaintiffs claim, would be to cut them off, in consequence of this increased charge, from the business of transmitting European messages from any point on their line between San Francisco and New York, and give the whole of that business to the defendants, they being the owners of competing lines.

It forms no part of the office of a court of justice to fix or regulate the prices which telegraph companies or others engaged in *quasi* public employments shall charge.  They have the right to fix their own rates, as well as to establish such rules and regulations in the conduct of their business as will enable them to carry it on efficiently, and to protect them from loss or damage in the prosecution of it.  The public nature of their business, however, has led to the recognition by courts of justice of certain general principles to which they must conform, being demanded by a due regard to the interests of the public.  Thus the rules and regulations they establish must, in themselves, be reasonable and, as far as is compatible, equal and uniform in their operation.  Not that they must be uniform in all instances, for there may be peculiar reasons, in certain cases, why they should be different.  But a telegraph company that is obliged, as in this State, by statute, to receive dispatches from individuals and other companies, upon the payment of its *usual* charges, cannot impose regulations or prices upon certain individuals or companies which are different and more onerous than they are in the habit of requiring from others in all respects similarly situated, unless there are reasons in the particular case which justify it which the law would consequently approve (*Vincent* v. *Rail Road Co.* (49 Ill. 33); *Sandford* v. *C. W. & E. Rwy. Co.* (24 Penn. St. 378); *Baxendale* v. *The Great Western Rwy. Co.* (5 Common Bench, N. S. 309, 336); *Garton* v. *Bristol, &c. Rwy. Co.* (6 Id. 639); *Marriott*

v. *The London, &c. Rwy. Co.* (1 Id. 499); *Pickford* v. *Grand Junction Rwy.* (10 Mees. & Wels. 399); *The State, &c.* v. *The Hartford, &c. R. R.* (29 Conn. 538); *De Rutte* v. *The New York, &c. Telegraph Co.* (1 Daly, 553, 558); Redfield on Carriers, §§477, 478, 483, 485, 488). I cannot hold that it is unreasonable for the defendants to require, where they receive dispatches in New York from other companies for transmission to Europe, that there should be attached to the telegram the date at which it is received by the defendants in New York, and the name of the company from whom it came, so that the date at New York and the name of the company may be attached to and form a part of the dispatch in its transmission to Europe; or unreasonable that they shall make an extra charge for this addition to the dispatch. There may be many reasons why the name of the company delivering it at New York, as a dispatch from another place, should be known to the different connecting lines through which it is to pass in the course of its transmission to its destination in Europe, and especially the company who are to deliver it to the person to whom it is addressed. Such a regulation may serve in some degree to counteract the designs of those who attempt to use the telegraph as a means of perpetrating fraud; but, whatever may be the grounds for adopting it, no court of justice would hold that such a regulation is unreasonable, if it is applied by the defendants to all telegraph companies in New York, without distinction, from whom they receive messages for transmission to Europe.

The plaintiffs say that, so far as their knowledge extends, it is the custom of all telegraph companies in the country to make no charge for the date, address, or signature of inland telegrams transmitted by them. This may be so; but it does not follow that the defendants are bound to pursue the same course in respect to telegrams received for transmission to Europe. For all I know, the custom may be otherwise in Europe, or in certain parts of it; but, whether it is so or not, is immaterial; for the law does not require one telegraph company to regulate its charges in accordance with the usage and custom of other companies, no matter how extensive or general the usage may be.

The affidavits of the plaintiffs are to the effect that this reg-

ulation, and the extra charge connected with it, is applied by the defendants to them alone. If this were the fact, it would be difficult to resist the conviction that it was applied to the plaintiffs for the reason they suggest—to cut them off, by means of the additional charge, from the business of transmitting European messages from any point on their route. But the defendants' affidavits would indicate that the regulation in respect to the date at New York and the name was general—that is, that it was applied to all telegraph companies; but their affidavits are silent as respects the extra charge, and the regulation is not incorporated in the conditions which are printed at length on the blanks supplied by the company whereon to write messages.

All that I can say, in conclusion, is that the injunction, as framed, requires the defendants to transmit messages in the order in which they are received, and that it must, in this respect, be modified, as from the general character of the language it might be construed as prohibiting them from requiring that the message should have added to it the date of its reception in New York, and the name of the company from whom it is received. In all other respects it should be sustained.

Order accordingly.