Candee vs. The Western Union Telegraph Company.

CANDEE VS. THE WESTERN UNION TELEGRAPH COMPANY.

TELEGRAPH COMPANIES: (1) *Always liable for gross negligence or fraud.* (2) *Printed regulations on night messages held void.* (3) *Company liable for breach of contract.* (4) *Rule of damages.* (5) *When nominal damages only allowed.* (6) *Case stated.* (7) *Sender should inform company.* (8) *Duty of agent to make inquiry not decided.* (9) *Rule as to cipher messages.*

PRACTICE. (10) *Final judgment, when awarded here.*

1. A regulation of a telegraph company designed to protect it from responsibility for *gross negligence or fraud* of its agents and employees in the transmission or delivery of a message sent for a valuable consideration, is unreasonable, against public policy, and void.

2. The printed regulations of the defendant company, subject to which all *night messages* are required to be sent, state that the company "will receive messages * * to be sent during the night, at one-half the usual rates, on condition that the company shall not be liable for errors or delay in the transmission or delivery or for nondelivery of such messages, *from whatever cause occurring*, and shall only be bound in such case to return the amount paid by the sender." *Held*, void.

3. Where a night message, written upon one of defendant's blanks, and delivered to its agent at Milwaukee, failed of being forwarded, through the gross negligence of such agent: *Held*, that the company was liable in damages as for a breach of its contract.

4. The measure of damages for a breach of such a contract is the loss which may be fairly considered as naturally arising from such breach, or which may *reasonably be supposed to have been in the contemplation of both parties* when they made the contract, as a *probable result* of a breach thereof.

5. Where the *import* of a telegraphic message is *wholly unknown* to the company's agent to whom the same is delivered for transmission, it cannot be assumed that he had in view any pecuniary loss as the natural or probable result of a failure to send such message; and in such case, upon a breach of the contract to transmit and deliver, the sender can recover only *nominal damages*, or the *amount paid for sending* the message.

6. Plaintiff delivered to defendant's Milwaukee agent, for transmission to his broker in New York, the following message *written in cipher:* "Buy for my account, and answer by telegraph, 250 shares Northwestern R. R. Common Stock." The meaning of the message was wholly unknown to defendant's operator at Milwaukee, but plaintiff

testifies that the employee to whom he handed the message, and the other persons engaged in the office at the time, knew " that it pertained to stock," because they knew that to be his business. He also testifies that he informed the boy in the office that it required attention and promptness in the sending, and that he left under the belief that his request would be complied with.  *Held*, that these facts, however they may tend to show *negligence* in the operator or other employee, do not show such a *communication of the meaning and character of the message* that the operator can reasonably be supposed to have contemplated a rise in the value of the stock named, by which plaintiff would become a loser, as one of the probable or possible results of a failure to promptly transmit the message.

7. To make the company responsible for a *rise in the value of said stock* between the time when the message would have reached plaintiff's broker if promptly sent, and the hour to which it was delayed, defendant's agent at Milwaukee should have been *informed of the contents of the message*, or of the *fact and extent of plaintiff's liability to loss* in the case of a delay in sending it.

8. Whether, where a message of this kind is *not in cipher*, but written in terms intelligible to the company's agent to whom it was delivered for transmission, and where *sufficient appears upon its face to indicate its character* and importance, it would then be the duty of such agent, if he wished to understand it more fully, *to make inquiry of the sender*, is not here decided.

9. Telegraphic messages sent in cipher, the purport of which is entirely unknown to the officers or agents of the company, fall within that principle of the law of common carriers which exempts the carrier from responsibility on the ground of *concealment by the owner of the goods* in respect to their nature, amount and value.

10. Where a case is tried in the court below *without a jury*, and all the evidence is certified up to this court, the trial here is a new one both on the law and the facts; and, on reversal, a new trial in the court below will not be granted, but a *final judgment* will be rendered *by this court*.


APPEAL from the Circuit Court for *Milwaukee* County.

Action for damages alleged to have been sustained by defendant's failure to deliver a " night message " within a reasonable time.    Answer, a general denial, and a separate defense alleging that the message was sent under a special contract. The action was tried by the court without a jury.    Upon the trial it was shown that the plaintiff was a banker and broker,

doing business in Milwaukee and engaged in buying and selling by telegraph, in the New York stock exchange, gold, government bonds and railway shares, through brokers acting as his agents in New York; that he had been engaged in this business for six years prior to December 25, 1871; and that for four years prior thereto, White, Morris & Co. had been his agents in New York. On December 25, 1871, plaintiff left the following cipher message at defendant's office, between eight and nine o'clock in the evening, for transmission to New York:

"MILWAUKEE, Dec. 25, 1871.

"White, Morris & Co., 18 Wall street, New York: Arch Barlier, Henry Augusta. W. S. CANDEE."

The interpretation of the message was as follows: " Buy for my account, and answer by telegraph, two hundred and fifty shares Chicago and Northwestern Railroad common stock."

Plaintiff's telegraphic correspondence with White, Morris, & Co. had been conducted in this cipher for about four years, dispatches having been sent and received by defendant's line in this cipher almost daily. The message was sent on the following blank:

" No. 45. HALF-RATE MESSAGES.

The *Western Union Telegraph Company* will receive messages for all stations in the United States, east of the Mississippi River, to be sent during the night, at one-half the usual rates, on condition that the company shall not be liable for errors or delay in the transmission or delivery, or for nondelivery of such messages, from whatever cause occurring, and shall only be bound in such case to return the amount paid by the sender. No claim for refunding will be allowed unless presented in writing within twenty days. WILLIAM ORTON, *President.*

GEO. H. MUMFORD, *Secretary.*

—— ——, 187—.

Send the following message subject to the above terms, which are agreed to.

To —— ——."

*Candee* took the message to defendant's office in person, and delivered it to the agent, and it was charged to his account at half rates. As to the instructions given by him to the agent, he testified as follows: "I handed it to the employee I found at the counter, with some general remark of inquiry as to whether it would be promptly sent, or something to that effect, and saw him go with it to the operating room, which is next to the receiving room. I don't know that I can state positively his remarks as to its being promptly sent — in a general way that it would be — he assented to my question. * * * I am positive that I did speak to the boy in the office, when I gave in the telegram, as to its being promptly sent. I cannot state positively about the words used ; they were to the general effect that I called his attention to the fact that it required attention." The message was received at defendant's office in Milwaukee at eight o'clock and forty minutes on the evening of the 25th, and was not sent forward until one o'clock and five minutes on the afternoon of the next day, and was delivered to White, Morris & Co. in New York at one o'clock and thirty-four minutes. They had previously received night messages from plaintiff, always receiving them prior to the opening of business on the stock exchange on the day succeeding the night of sending. *Candee* was known to defendant's agents in Milwaukee as being engaged in buying and selling stocks, etc., by telegraph; and his office was within one block of defendant's office. The shares of stock in question could have been purchased at the opening of the stock exchange in New York, December 26th, at $64.75 per share, but at the time of the receipt of the message they had advanced to $66.62 1-2, at which rate White, Morris & Co., immediately on receipt of the message, purchased 200 shares for plaintiff's account, and 50 shares at the rate of $67, which were the lowest prices at which the shares could be purchased.

The court found for the plaintiff, and fixed his damages at $487.50, the difference between the price at which the shares

could have been bought at the opening of the stock exchange, and the price at which they were purchased on receipt of the message, with interest and costs. Judgment accordingly; from which defendant appealed.

*Finches, Lynde & Miller,* for appellant, contended that the contract, as shown in the " night message " blank, was a legal contract, binding in all its parts. Plaintiff had his election to pay a higher rate for the transmission of his message and have it insured, or to pay the rate required for night messages and accept all risks himself. The exact conditions and terms of each bargain were fully known to both contracting parties, and they met on equal ground. Plaintiff elected to accept the night contract, and must abide by his election. " No person shall be allowed at once to benefit by and repudiate an instrument, but if he chooses to take the benefit which it confers, he shall like-wise take the obligation or bear the *onus* which it imposes; no person can accept and reject the same instrument." Hermann on Estoppel, title " Election."

*Davis & Flanders, contra,* argued that the defendant could not stipulate, even in express terms, against the negligence or misconduct of its employees, since to allow this would be contrary to public policy. *True v. International Tel. Co.,* Allen's Telegraph Cases, 530 (to appear in 60 Me.); *Tyler v. W. U. Tel. Co.,* Supreme Ct. Illinois, March, 1873, 8 Albany Law Journal, 181; *Birney v. N. Y. & W. Tel. Co.,* 18 Md., 341; *Ellis v. American Tel. Co.,* 13 Allen, 226; *Sweatland v. Ill. & Miss. Tel. Co.,* 27 Iowa, 433; *U. S. Tel. Co. v. Wenger,* 55 Pa. St., 262; Scott & Jarnagin on Telegraphs, §§ 201 and 202. Plaintiff was not bound to explain the importance of the message, nor the message to bear on its face evidence of its importance. So long as it was clearly and legibly written, plaintiff had done all that was necessary. *Rittenhouse v. Ind. Line of Tel.,* 44 N. Y., 263; Scott & Jarnagin, §§ 166, 167, 267. The rule of damages is the difference between the price at which the stock could have been purchased, had the dispatch arrived in a reasonable time,

and the price at which it was purchased on arrival.  *Ritten-house v. Ind. Line of Tel.*, *Birney v. N. Y. & Wash. Tel. Co.*, and *U. S. Tel. Co. v. Wenger*, *supra;* Scott & Jarnagin, §§ 402, 405, 406 and 409, note.

The following opinion was filed at the June term, 1873.

Dixon, C. J.   It is unnecessary to consider this case with reference to the regulations governing the receipt, transmission and delivery of day messages, although such regulations were put in evidence by the company.   The message in question was a night message, written upon what is called a "night message blank," furnished by the company, and which contained special regulations for messages of that description.   The regulations printed upon and constituting the heading of the night message blank, and underneath and subject to the terms of which the message was written and directed to be sent, are the only ones applicable to such message, or which can be said to have formed the contract between the plaintiff and the company. It does not concern the court, therefore, to examine or consider the reasonableness or validity of the regulations touching day messages, but only those which relate to half-rate or night messages; and we shall confine ourselves to the latter.

All the courts concur, we believe, in holding that a regulation the design of which is to protect the company from responsibility on account of the gross negligence or fraud of its agents and employees in the transmission or delivery of a message which the company undertakes for a valuable consideration to send, is unreasonable, against sound public policy, and void. The correctness of this conclusion is as ably vindicated and sustained in the opinion of the supreme court of Illinois, by Breese, J., in *Tyler v. The Western Union Telegraph Co.*, 8 Albany Law Journal, 181, as in any case which has fallen under our observation.   The same proposition has been frequently affirmed in other cases and by other courts, and is distinctly recognized in *Redpath v. Western Union Telegraph Co.* (supreme

court of Mass., April, 1873), a manuscript copy of the opinion in which has been furnished us by counsel for the company since this cause was argued and submitted. We do not dwell upon a principle so generally acknowledged, and which meets our entire approbation, but proceed to inquire whether such is the purpose of the regulations here in question.

We think there can be but one answer to this inquiry, and that is, that the regulations were intended to secure the company against liability for the injurious consequences flowing from its own negligence and omissions and from those of its agents and operators, in and about the performance of its contract entered into with the sender of the message. The supposed exemption is broad and sweeping, and calculated, no doubt, to relieve the company from all responsibility for the improper or insufficient performance or attempted performance of the contract, or for the entire failure to perform it, from whatsoever cause occurring. Aside from the objections resting on grounds of public policy, and which forbid the company from stipulating for immunity from the consequences of its own wrongful acts, it seems very clear to us that there can be no consideration for such stipulation on the part of the sender of the message, and that, so far as he is concerned, it is void for that reason, although exacted by the company and fully assented to by him. Either the company enters into a contract with him, and takes upon itself the burden of some sort of legal obligation to send the message, or it does not. It would be manifestly against reason and what all must assume to be the intention of the parties, to say that no contract whatever is made between them ; and nobody, not even the officers or representatives of the company, asserts such a doctrine. It would seem utterly absurd to assert it. Holding itself out as ready and willing and able to perform the service for whosoever comes and pays the consideration itself has fixed and declared to be sufficient, and actually receiving such consideration, it can not be denied, we think, that a legal obligation

arises and duty exists on the part of the company to transmit the message with reasonable care and diligence according to the request of the sender. Such being the attitude of the company, and the obligation which it assumes by accepting the payment, the question arising is, whether it can, at the same time and as part of the very act of creating the obligation, exact and receive from the other party to the contract a release from it. The regulations under consideration, if looked upon as reasonable and valid, completely nullify the contract by absolving the company from all obligation to perform it, and the party delivering the message gets nothing in return for the price of transmission paid by him. Is it possible for the company, or for any other party entering into a contract for a valuable consideration received, to promise and not to promise, or to create and not to create an obligation or duty, at one and the same moment and by one and the same act? The inconsistency and impossibility of such things are obvious. But if there were no such difficulties, or if the occasion or circumstances were such that a valid release might be executed, and it be regarded in that light, still the objection exists that there is no consideration whatever to support it, and it must be held void on that ground. If it be urged that the sender receives his consideration in the reduced price of transmission, or because the company undertakes to send the message at one-half the usual rates of transmitting day messages, that argument ends in proving that the company does not undertake to send the message at all, and that no contract or agreement on its part is made or entered into for that purpose. If the company promises or binds itself at all for the rate or consideration named and which it is willing to and does accept, then the smallness of such consideration can not operate to relieve from the promise or to destroy the obligation thus created. Regarding the regulations in this light, therefore, as well as in that of correct public policy, it is seen that effect can not be given to them as a means of protection or escape on the part of the

Candee vs. The Western Union Telegraph Company.

company from all liability for the nonperformance of its contract. The regulations can not serve to shield the company from the consequences resulting from the gross negligence or fraud of its officers or agents, or from their entire failure to perform the service, no good excuse for such failure being offered or shown.

The omission of the operator here to send forward the message during the night was the result of gross negligence and inattention to duty on his part. It was a total failure to perform the contract, in excuse of which no facts whatever were shown or offered by the company, upon which the burden of making such proof rested.

We come now to the question of the measure of damages in this case; and herein we think the court below was in error. We are of opinion that the plaintiff is entitled to recover no more than nominal damages, or, as specified in the regulations, the amount paid for transmitting the message. There appears to be no division of opinion among the courts, that in contracts of this class the measure of the damages to be recovered for the breach is the same as that which obtains in actions upon contracts in general, the rule for the assessment of which has ever been regarded as correctly expressed in the leading case of *Hadley v. Baxendale*, 9 Exch., 341; *S. C.*, 26 Eng. Law & Eq. R., 398. The rule as there stated is, that where two parties have made a contract which one of them has broken, the damages which the other ought to receive in respect of such breach of contract should be either such as may fairly and substantially be considered as arising naturally, that is, according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it. The case and the rule were referred to and approved by this court in *Sheppard v. The Milwaukee Gas Light Co.*, 15 Wis., 318, and afterwards followed in *Richardson v. Chynoweth*, 26 Wis., 656.

It can not be said or assumed that any amount of damages or any pecuniary loss or injury will naturally ensue or be suffered, according to the usual course of things, from the failure to transmit a message, the meaning and import of which are wholly unknown to the operator. The operator who receives, and who represents the company, and may for this purpose be said to be the other party to the contract, can not be supposed to look upon such a message as one pertaining to transactions of pecuniary value and importance, and in respect of which pecuniary loss or damages will naturally arise in case of his failure or omission to send it. It may be a mere item of news, or some other communication of trifling and unimportant character. Ignorant of its real nature and importance, it can not be said to have been in his contemplation, at the time of making the contract, that any particular damage or injury would be the probable result of a breach of the contract on his part.

In this case the message was in cipher, its meaning wholly unknown to the operator, and no explanation given of its true character and import. It is true that the plaintiff testified (and his was the only testimony upon the subject) that the employee to whom he delivered the message, and the other persons engaged in the office at the time, knew that the message "pertained to stock, because they knew my business to be that business." And it is true he likewise testified that he informed the boy in the office that it was a telegram which required attention and promptness in the sending, and that he left under the belief that his request would be complied with. But these facts, however much they may tend to show negligence in the employee or operator, fail to bring the case within the rule for the assessment of damages above stated. They fail to show that it was made known at the office that the transaction was one relating to the purchase or sale of stocks; or, if this had been made known, they fail to show that the agents of the company received any information as to the kind or quantity of stock di-

rected to be purchased. For all that the operator knew or was informed, it might have been some communication or inquiry concerning stocks, from the nontransmission of which no special damage would or could ensue. He can not be said, therefore, to have contemplated a rise in the value of stock by which the plaintiff became a loser, as the probable result, or one of the probable or possible results, of his failure to transmit the message and consequent breach of the contract. To have put the company in a position of responsibility for the difference in the price of the stock between the opening of the New York stock exchange on the next morning, when the message should have been in the hands of the plaintiff's agents in New York, and the hour of half-past one in the afternoon, when the same was transmitted to and reached such agents, it was necessary that the agent or operator of the company at Milwaukee should have known the contents or meaning of the message, either by the same having been written out in plain and intelligible words, or by its having been otherwise explained to him. It might not perhaps have been necessary to give a full and literal translation, but the value to the plaintiff of the message in a pecuniary sense, if we may be permitted so to speak, or the sum which the plaintiff was likely or liable to lose, or in which he might in the ordinary course of events be damaged, in case the message was not accurately and speedily transmitted, ought at least to have been communicated to the agent or operator of the company.

Counsel for the plaintiff contend that if the agent or operator was not apprised of the nature and importance of the communication, it was his fault, and that the duty rested upon him to make inquiry of the plaintiff in this particular. They argue that the plaintiff was not bound to make explanation, but that it was incumbent on the agent or operator to make inquiry if further information was needed for the protection of the company. If we except the views expressed by the authors of the treatise upon the Law of Telegraphs (Scott

& Jarnagin), § 166 and note, counsel are without authority any-where in support of this position, whilst the decisions and ut-terances which have come from the bench in numerous instances have been quite uniform and clear against it.   We do not feel called upon to examine the cases *seriatim*, nor even to refer to them by name, upon this or any other point, since they have all been so conveniently and methodically collected and ar-ranged in Allen's Telegraph Cases.   The case of *Rittenhouse v. The Independent Line of Telegraph*, 44 N. Y., 263 (Allen, 570), also relied upon by counsel, turned upon the ground that suffi-cient appeared on the face of the message to indicate its char-acter and importance; and the court said that if the agents wished to understand it more fully, they could have inquired of the senders.   In analogy to the rule which prevails on the delivery of goods to a common carrier, where, if his liability is not limited by special notice, and if there are no improper means or artifice adopted by the person who sends the goods, to conceal the nature and value of the contents of the box or parcel so as to deceive or mislead the carrier, the person send-ing the goods is not bound to make the disclosure unless in-quiry is made of him on the subject, the courts might, perhaps, have held in respect to these messages to be sent by telegraph, that the duty of disclosure did not exist except upon inquiry made of the sender by the agents of the telegraph company. Angell on the Law of Carriers, § 264.   But in regard to these messages in cipher, the signification and purport of which are wholly unknown to the agents and operators, the question would still have arisen, whether they should not be looked upon as a means or artifice adopted by the sender to conceal the nature and importance of the communication, and thus have brought such messages within the operation of another rule or principle which exempts the common carrier from re-sponsibility.   Angell, §§ 258 to 263.   The principle which re-lieves the common carrier on the ground of *concealment* by the owner of the goods, in respect to the nature, amount and value

of them, seems to be that which is most nearly suited to the case or transaction in hand; and as it is the one which has been thus far acted upon and applied by other courts, we feel no hesitation in adopting it.

This cause was tried in the court below before the judge without a jury, and all the evidence is certified up. The trial in this court is therefore a new or second one, both on the law and the facts, and the judgment of this court is final. Another trial in the court below is not to be directed in such a case.

*By the Court.* — The judgment appealed from is reversed, and the cause remanded with directions to render judgment for the plaintiff for the sum paid by him for the transmission of the message, and that thereupon the costs be taxed and judgment entered therefor in the action as prescribed by law.

A motion for a rehearing was denied at the January term, 1874.