JOHN C. BARTLETT *vs.* WESTERN UNION TELEGRAPH COMPANY.

*Telegraph Company—an exemption from liability declared void. Damages.*

A rule adopted by a telegraph company, that it will receive and send messages by night at half its usual rates "on condition that the company shall not be liable for errors or delay in the transmission or delivery, or for the non-delivery of such messages, from whatever cause occurring, and shall only be bound in such case to return the amount paid by the sender," is against public policy;—and is, therefore, void, even when assented to by the sender.

It is void also, because its terms are repugnant, assuming to impose an obligation, and, by the same act, to release from all obligation.

In an action to recover damages of a telegraph company for an error in the transmission of a message, in the absence of any rule or contract fixing the measure of liability, the plaintiff makes out a *prima facie* case by proof of the undertaking, error and damage, and throws the burden upon the company, to show that the error was caused by some agency for which it is not liable.

Bartlett *v.* W. U. Tel. Co.

On report.

Case submitted to the determination of the court, as the law and facts might require, and to award the damages, if any, to which the plaintiffs might be found entitled.

July 12, 1870, Bartlett & Wood of Gardiner, Maine, (the plaintiffs) telegraphed to their correspondents at Chicago, Ill., Hobbs & Co., to buy corn of a certain quality for them. As written, the dispatch directed the purchase of *ten* thousand bushels; as delivered to Hobbs & Co., it read "one thousand bushels," &c., which quantity they bought on account of Bartlett & Wood, on the day succeeding the reception of the order, for eighty-five cents a bushel. On the twelfth day of July, 1870, Bartlett & Wood wrote to Hobbs & Co., stating the purport of their telegram of the same date. The reception of this letter led to the discovery of the error in the transmission of the message, and under new instructions, on the eighteenth or twentieth day of July, 1870, Hobbs & Co., bought the other nine thousand bushels of corn needed to fill the original order, but had to pay ten cents more per bushel for it, the price having risen in the market to that extent in the meantime. The additional $900 which they were thus compelled to pay, the plaintiffs demanded of the defendant corporation, July 28, 1870, but payment was refused, and this suit brought to recover it. The defence was that the dispatch was written and delivered to the company upon a blank of this tenor, and upon the conditions therein specified, to wit:—

"No. 45.

### HALF RATE MESSAGES.

The Western Union Telegraph Company will receive messages for all stations in the United States east of the Mississippi River, to be sent during the night at one half the usual rates, on condition that the Company shall not be liable for errors or delay in the transmission or delivery, or for non-delivery of such messages, from whatever cause occurring, and shall only be bound in such case to return the amount paid by the sender.

No claim for refunding will be allowed, unless presented in writing within twenty days.

O. H. Palmer, Secretary.    William Orton, President.

GARDINER, ME., July 12, 1870.

Send the following message subject to the above terms, which are agreed to.

To J. B. HOBBS & Co., Chicago.

Ship us ten thousand bushels choice No. 2 (two) high-mixed corn. BARTLETT & WOOD."

11 pd. 126, E. D. & A. 7-15 P. M."

*Baker & Baker*, for the plaintiffs.

The stipulations upon the defendants' night-message blanks are unreasonable and void. *True v. Int. Tel. Co.*, 60 Maine, 9.

The measure of damages is the difference between what the corn cost on the day the first thousand bushels were bought, and its cost when the rest of the order was filled, after discovery of the error. 60 Maine, 9. *Squire v. W. U. Tel. Co.*, 98 Mass., 232 ; *Rittenhouse v. Ind. Tel. Co.*, 1 Daly, 474.

*Bradbury & Bradbury*, for the defendants.

The paper upon which the plaintiffs wrote their message, and signed it, contained a contract, and the fact that it was partly in print, is immaterial. *Lewis v. G. W. Railway*, 5 Hurl. & Nor., 867 ; *Breese v. U. S. Tel. Co.*, 45 Barb., 274 ; *French v. Buffalo*, 4 Keyes, (N. Y.,) 108 ; *Rice v. Dwight Co.*, 2 Cush., 80 ; *W. U. Tel. Co. v. Carew*, 15 Mich., 524 ; *Squire v. N. Y. Cent. R. R. Co.*, 98 Mass., 239 ; *Grace v. Adams*, 100 Mass., 505 ; *Camp v. W. U. Tel. Co.*, 1 Metc., (Ky.) 164 ; *Wolf v. W. U. Tel. Co.*, 62 Penn. St. R., 83.

The defendants' liability is purely matter of contract. *Playford v. U. K. Tel. Co.*, 10 Best & Sm., 759.

They are not common carriers. See cases cited *supra*. *Ellis v. Am. Tel. Co.*, 13 Allen, 226 ; *Leonard v. N. Y. Tel. Co.*, 41 N. Y., 571 ; *Birney v. N. Y. Tel. Co.*, 18 Md., 341.

If they were, they could limit their liability. *York Co. v. Cent. R. R. Co.*, 3 Wallace, 107 ; *Bissell v. N. Y. Cent. R. R. Co.*, 24 N. Y., 442 ; *Dove v. N. J. Steam Co.*, 1 Kernan, (N. Y.) 483.

The limitations upon this blank are reasonable and proper. See cases cited *supra*. *McAndrew v. Tel. Co.*, 33 Eng. L. & Eq., 180 ; *Mann. v. W. U. Tel. Co.*, 37 Missouri, 261 ; *U. S. Tel. Co. v. Gildersleeve*, 29 Md., 232 ; *Ames v. N. Y. Union Ins. Co.*, 14 N. Y., 256 ; *Ripley v. Ætna Ins. Co.*, 30 N. Y., 136 ; *Roach v. N. Y. & E. R. R. Co.*, 30 N. Y., 548.

DANFORTH, J.   On the twelfth day of July, 1870, the plaintiffs left with the defendants a message to be sent from Gardiner to Chicago, by night, directing the purchase of ten thousand bushels choice No. 2 high-mixed corn. As received by the persons to whom it was addressed, it read one thousand instead of ten thousand bushels.

In consequence of this error a loss ensued, which the plaintiffs claim the defendants are legally liable to make up to them.

Upon the blank used we find printed a provision as follows : "The Western Union Telegraph Company will receive messages for all stations east of the Mississippi River, to be sent during the night at one-half the usual rates, on condition that the company shall not be liable for errors or delay in the transmission or delivery, or for non-delivery of such messages, from whatever cause occurring, and shall only be bound in such case to return the amount paid by the sender.

No claim for refunding will be allowed, unless presented in writing within twenty days."

Then follows next above the written message, the words : "Send the following message subject to the above terms, which are agreed to."

It is now contended that this provision either as a rule established by the company, or as a contract entered into by the parties relieves the defendants from all liability in this action. If the condition is of binding force, either as a regulation or contract, such clearly would be its effect. The signature of the plaintiffs obtained without fraud, would be conclusive proof of their knowledge of it as a rule, whatever it might be in regard to their assent to it as a contract.

That a telegraph company may make all proper and needful rules to enable it with convenience and despatch to do the business of its customers, is now unquestioned. This may be done even without the consent of those doing business with it. Knowledge alone being sufficient to bind them. With a contract it is entirely different; that can be binding only upon those who assent to *its* terms.

It has been held in many cases, that a company may make rules limiting its liability in certain cases, and perhaps it is now too late to deny this proposition, though it seems to be materially enlarging the meaning of the term, when a power given to a corporation or an individual to regulate the manner or method of doing business with the public, is converted into a means of limiting the liability which by law is attached to that business. But however that may be, all courts agree that a rule to be of binding force must be reasonable, whether its purpose is to facilitate business or limit liability. There may be a wide disagreement as to whether any given rule is reasonable, but none, it is believed, as to its want of validity, when its unreasonableness is once conceded.

In *True v. International Telegraph Company*, 60 Maine, 9, a rule similar to the one now in question, was held to be unreasonable and therefore void. After a careful re-examination of that case, and the reasoning upon which it is founded, we see no reason for changing the conclusion there reached. It is claimed that this case differs somewhat from that. This is true as to some of the facts, but not as to the principle of law applicable. So far as the rule goes, it is in effect the same, or if in any thing different, the one now before us, is more clearly unreasonable. While it was possible to construe the former so as not to include exemption from damages, arising from the neglect of the company, or want of skill or care on the part of the employees, the language of the latter will admit of no such meaning.

To prevent any possibility of such an interpretation, we find inserted the words "from whatever cause occurring." Then as to the facts, in the former case there was no delivery of the message,

and no reason given for its non-delivery, while in this case, an effort seems to have been made to transmit the message, and one was delivered though materially different from that sent. It is claimed that in this respect, there is such a difference between the cases, that the two cannot rest upon the same principle. Some of the cases seem to countenance this view on the ground that a neglect or refusal to perform or to enter upon a performance, presents a question very materially differing from any that can arise on an error or mistake in performing. But the rule itself makes no such distinction. The error in transmission and non-delivery are put upon the same ground, and absolute exemption from liability in each case provided for, whatever may be the cause producing it. Now it is very clear, that negligence may be quite as injurious in the one case as in the other. It may often be that an erroneous message delivered, will cause more damage than non-delivery, and if the company, for any reason, choose to suppress the information sent, it is quite as easy to do it by forwarding a different message, as by suppressing it. It is because of its broad provisions covering every case of non-fulfilment of duty, under the law, that we declare the rule unreasonable.

In a case like this, where a party has assumed a public or *quasi* public employment, one which has become a commercial necessity, and to which business people must necessarily, more or less resort, and in which they must trust entirely to servants, in the selection of whom they have no voice whatever, it would seem that there could hardly be a difference of opinion, as to the unreasonableness of a rule which opens so wide a door for the immunity of negligence, if not of fraud. Though it may admit of serious doubt, whether public policy would permit persons or companies occupying the relation to the business community which the defendants in this case do, to limit in any degree the liability imposed upon them by law, in view of the many decisions from courts of the highest respectability allowing it, we do not wish to be understood as denying it, nor indeed have we any occasion to do so in this case.

We are not unmindful that many cases have been cited, and

relied upon, as supporting the binding force of the rule invoked by the defendants in this case, and some of them apparently, (perhaps really) do so, while quite as many of them may be explained consistently with, if not directly sustaining, the view which we have taken. They all so construe the rule passed upon, as not exempting from, or limiting, the liability imposed by law, arising from a want of the requisite skill or care, and in most or all of the cases such a construction flows naturally enough from the language used, while no such meaning can be given to the one now under consideration. It is true it might be held applicable to such cases as come within the authority of the company to limit their responsibility, and inapplicable to damages arising from negligence or fraud. But in so doing, we must necessarily expunge a portion of the words used, and thereby establish for the company a rule materially different from that ordained by themselves. We can only construe rules and contracts, and not make them.

It will be noticed that the rule of these defendants in relation to night messages, that which we are now considering, has no provision for repeating the message, a provision upon which many of the cases rest. Such are the cases of *Camp v. W. U. Tel. Co.*, 1 Metc., (Ky.) 164, (Allen on Telegraphs, 85 ;) *McAndrew v. The Electric Tel. Co.*, 17 C.B., 3 ; (Allen, 38 ;) *Breese v. U. S. Tel. Co.*, 45 Barb., 274, (Allen, 663.) Hence in these cases and others of the like kind, the precise question now before us was not raised.

The same provision is found in *Ellis v. American Telegraph Company*, 13 Allen, 226, and also the further provision pledging the company to good faith in their endeavors "to send messages correctly and promptly," thereby authorizing, and even requiring the construction put upon the rule that it did not provide against want of skill or care, and while in that view the rule is held to be reasonable, it is said in the opinion: "Of course, a party cannot in such way protect himself against the consequences of his own fraud or gross negligence, or the fraud or gross negligence of his servants or agents. Nor can he escape all liability or responsi-

bility in the performance of the service or duty which he undertakes."

*Warren v. Western Union Telegraph Company*, 14 Missouri, 472, is founded upon the same provision requiring the message to be repeated, and holds also, that the rule does not and can not exempt the company from the consequences of gross negligence.

*Sweatland v. Ill. & Misso. Tel. Co.*, 27 Iowa, 432, is to the same purport. In this last case, Dillon, C. J., remarks: "The considerations mentioned by the appellants are quite sufficient to justify the court in holding reasonable the condition as to repeating messages, and exempting it from liability for mistakes in unrepeated messages, occasioned by unavoidable or uncontrollable causes, provided proper instruments have been used, and proper care and skill exercised by the company's employees to avoid or prevent mistake."

Again, he says: "But I deny that companies can adopt general printed rules, exacting as a condition of sending messages, that the sender shall exonerate or release the company from damages caused by defective instruments, or by the want of proper skill in the operators, or by their failure to use due care."

To the same effect is Redfield on Railways, (3d ed.,) 244. In Shearman & Redfield on Negligence, § 565, near the end, it is said: "We certainly think that such rules should be held void; and being illegal in their terms and plain import, they ought not to be given effect, even in those cases which might lawfully be provided for, and which are covered by their terms."

Thus most, if not all, the cases upon this subject refer to rules requiring the repeating of messages to insure accuracy, and seem to be justified in their conclusion on the ground that owing to the liability to error, from causes beyond the skill and care of the operator, it is but a matter of common care and prudence to have the messages repeated; the neglect of which in messages of importance, after being warned of the danger, is a want of care on the part of the sender, and as the person sending the message is presumed to be the best judge of its importance, he must on his

own responsibility make his election whether to have it repeated. These cases also hold with great, if not entire, unanimity, that even under such circumstances, the company can only limit, but not take away their entire liability. If the doctrine of these cases be sound, the rule invoked in the case at bar must necessarily, as a rule, be void. In its very terms it relieves the company from all liability for any errors, delays, or omissions, "from whatever cause occurring."

But it is elaborately, as well as ably, argued in the defence that here is a contract, fairly and intelligently entered into by the parties, and by the terms of that contract their rights and liabilities must be governed. While we concede that a party may sometimes limit his liability by special contract beyond what he can by a rule or regulation, yet it is settled on a foundation too firm to be shaken, that even contracts in violation of good faith and public policy cannot be sustained. The interests of the public must be protected, even though they clash with those of private individuals.

These defendants are holding at least a *quasi* public employment. As such they will not be permitted to compel individuals to assent to contracts inconsistent with the public interest, or which tend to excuse the want of entire fidelity in the exercise of such employment. If, then, the objection to the rule is that it relieves the defendants from obligations imposed by law for the purpose of securing fidelity to the public, the same objection would lie against it as the foundation of a contract. If this be a contract it authorizes the grossest negligence, or fraud even, with entire impunity. The courts might, perhaps, have some latitude in applying rules, but a contract must abide the terms assented to by the parties. Courts can only enforce contracts, not make them.

When we consider that, under present methods of transacting business, the telegraph has become a commercial, if not a social necessity, and that parties having occasion to employ it can have their rights preserved only by having their messages promptly and faithfully delivered, it would seem to be self-evident that the contract invoked in the defence is utterly void.

But it is difficult to conceive on what grounds it can be called a contract. While we concede that the forms of one have an existence, the substance is wanting. The parties are not in a condition to contract upon equal terms. The company holds itself out to the public as in readiness to transmit all such dispatches as may be presented for that purpose. The telegraph has created a necessity for its use. Business can be transacted without it only at a very great disadvantage. In most places there is no choice as to lines, and where there is, it is so limited that a virtual monopoly exists. On the other hand the occasion for sending a message often comes suddenly, or with so short notice as to leave no time for deliberation, or to examine and consider the terms offered. Under such circumstances the sender seldom, if ever, reads what is printed upon the blank or gives any intelligent assent thereto.

These suggestions may, however, be considered as applicable to the proof offered to show the existence of a contract, rather than as bearing upon its validity; and admitting that it is competent for the parties to make a contract limiting the defendants' liability for errors arising from causes other than a want of proper care and skill on their own part or that of their employees, and that the alleged contract in this case is sufficient in form and sustained by sufficient proof, we do not admit the existence of any special contract in any proper sense of the term, limiting the defendants' liability. There can be no contract unless the contracting party assumes some responsibility, or undertakes to do or perform some act. In this case, the terms of the alleged agreement impose no duty whatever upon the defendants, or if they do, by the same instrument they are absolved from all such duty and relieved from all responsibility in regard to it. To be sure they agree or propose to receive the message and send it by night, but on condition that they may send that or another, or none whatever. The same act by which they undertake to do, releases them from all obligation to perform. Interpreting the several parts of the contract as one whole, it imposes no undertaking to send the message, or if sent, that it shall go correctly.

Bartlett *v.* W. U. Tel. Co.

But if it is said that there is a contract to send the message on the part of the company and a release for error, delay or failure in performance, by the sender, the case stands no better for the defence. For such a release there is no consideration, and therefore it is of no binding force. Upon this point the remarks of the court in *Candee v. Western Union Telegraph Company,* reported in 8 American Law Review, 374, in discussing the same rule now under consideration, are so forcible and conclusive, we cannot forbear quoting : "The supposed exemption is broad and sweeping, and calculated, no doubt, to relieve the company from all responsibility for the improper or insufficient performance, or attempted performance of the contract, or for the entire failure to perform it, from whatever cause occurring. Aside from the objections resting on grounds of public policy, and which forbid the company from stipulating for immunity from the consequences of its own wrongful acts, it seems very clear to us that there can be no consideration for such stipulation on the part of the sender of the message, and that, so far as he is concerned, it is void for that reason, although exacted by the company, and fully assented to by him. Either the company enters into a contract with him, and takes upon itself the burden of some sort of legal obligation to send the message, or it does not. It would be manifestly against reason, and what all must assume to be the intention of the parties, to say that no contract whatever is made between them, and nobody, not even the officers, or representatives of the company, assert such a doctrine."

"It would seem utterly absurd to assert it. Holding itself out as ready and willing and able to perform the service for whomsoever comes and pays the consideration itself has fixed and declared to be sufficient, and actually receiving such consideration, it cannot be denied, we think, that a legal obligation arises and duty exists, on the part of the company to transmit the message with reasonable care and diligence, according to the request of the sender. Such being the attitude of the company and the obligation it assumes by accepting the payment, the question arising is, whether

it can at the same time, and as part of the very act of creating the obligation, exact and receive from the other party to the contract a release from it. The regulations under consideration, if looked upon as reasonable and valid, completely nullify the contract by absolving the company from all obligation to perform it, and the party delivering the message gets nothing in return for the price of transmission paid by him. Is it possible for the company, or for any other party entering into a contract for a valuable consideration received, to promise and not to promise, or to create and not to create an obligation or duty, at one and the same moment, and by one and the same act? The inconsistency and impossibility of such things are obvious. But if there were no such difficulties, or if the occasion or circumstances were such that a valid release might be executed and it be regarded in that light, still the objection exists that there is no consideration whatever to support it, and it must be held void on that ground. If it be urged that the sender receives his consideration in the reduced price of transmission, or because the company undertakes to send the message at one-half of the usual rates for sending day messages, that argument ends in proving that the company does not undertake to send the message at all, and that no contract or agreement, on its part, is made or entered into for that purpose. If the company promises or binds itself at all for the rate or consideration named, and which it is willing to and does accept, then the smallness of such consideration cannot operate to relieve from the promise, or to destroy the obligation thus created."

We find, then, the provision under consideration equally invalid whether as a regulation of the company or as the foundation of a special contract between the parties, and we must look to the implied contract arising from the company's undertaking to transmit the message, to ascertain its duties and liabilities.

That the liabilities of a common carrier do not attach to business of this kind may now be considered as well settled. That messages of the highest importance are often sent requiring a proportionate degree of care, may be considered equally certain.

To require a degree of care and skill commensurate with the importance of the trust reposed, is in accordance with the principles of law applicable to all undertakings of whatever kind, whether professional, mechanical, or that of the common laborer. There is no reason why the business of sending messages by telegraph should be made an exception to the general rule. This requires skill as well as care. If the work is difficult, greater skill is required. It is often necessary to entrust to this mode of communication, matters of great moment, and therefore the law requires great care. It is necessary to use instruments of a somewhat delicate nature, and accurate adjustment, and therefore they must be so made as to be reasonably sufficient for the purpose. The company holding itself out to the public, as ready and willing to transmit messages by this means, pledges to that public the use of instruments proper for the purpose, and that degree of skill and care adequate to accomplish the object proposed. In case of failure in any of these respects the company would undoubtedly be liable for the damage resulting. This would not impose any liability for want of skill or knowledge not reasonably attainable in the present state of the art, nor for errors resulting from the peculiar and unknown condition of the atmosphere, or any agency from whatever source, which the degree of skill and care spoken of, is insufficient to guard against or avoid.

The question now arises as to whether the plaintiffs have made out their case. They have proved that the message was not correctly transmitted, and from that error damage has resulted. The company undertook to send the message, and of course to send it correctly. The present state of the art is not such as to render error the rule, but rather the exception. We may with great confidence expect that with the ordinary degree of skill and care, mistakes will be avoided. Besides, the company undertook to perform the work, and have failed to do so. Under these circumstances it is sufficient for the plaintiffs to prove the failure. After that, if the defendants would excuse themselves, the burden is upon them to show that the failure was caused by some agency

for which they were not responsible. This is in accordance with well settled principles of law as applicable to contracts generally, nor does any hardship result from this rule. The means of proof are almost entirely within the power of the defendants, and equally beyond the reach of the plaintiffs. Shearman & Redfield on Neg., § 559; *Rittenhouse v. The Ind. Line of Tel.*, 44 N. Y., 263; *DeRutte v. Tel. Co.*, Allen's Tel. Cases, 284.

In excuse for their non-performance the defendants offered to show "the nature of this business; how it is carried on, and its liability to error and mistake," and other testimony to the same effect. This testimony was rejected, and in this we see no error. It is all consistent with the plaintiffs' theory that there was a want of skill or care, which caused the mistake. The difficulties of the business, its liability to error, or to be affected by the condition of the atmosphere, or that the characters used were such as might easily be mistaken one for the other, or on account of the electrical condition of the atmosphere liable to run into each other, may be suggestions tending to show the necessity of greater care or skill, but the proof, if admitted, would not show, or tend to show, that this error was caused by any of these difficulties, or by any cause for which the company is not liable. There is no suggestion even that it was caused by any of these agencies. In accordance with these views is the well considered case of *Tyler v. Western Union Telegraph Company*, decided in Illinois, and reported in the Albany Law Journal, vol. 8, pp. 181 and 337. The rule of damages is settled in *True v. International Telegraph Company*, before cited, in accordance with all the authorities.

The message was delivered in Chicago, July 13, 1870. It then directed the purchase of one thousand bushels of corn. On the sixteenth day of July, the error was discovered in Chicago, and the plaintiffs were notified by telegraph. On the same day, which was Saturday, they telegraphed to their agents to purchase the balance of the ten thousand bushels. What time this telegram arrived does not appear, but from the testimony, it is fair to presume, not in season to enable the purchase to be made before

Monday. It was made as soon as Monday or Tuesday. We cannot say there was any unnecessary delay, but the conclusion is, that in this respect the plaintiffs used due diligence to save themselves from loss.

The first corn was purchased for eighty-five cents per bushel; for the last was paid ninety-five, and the plaintiffs have introduced testimony tending to show that the fair market price was paid each time. The defendants have also introduced testimony tending to show that the price paid was too high in each case. This testimony is somewhat indefinite, and relates mainly to a different kind of corn, and that of a lower grade, while that of the plaintiffs is of actual purchases, and definite proof that the price was in accordance with the then market rates. Besides the most reliable testimony of the defendants, that of Benj. T. Howard, whose business it was to make a daily report of the market, shows an advance in the lower grade of corn from the fourteenth to the eighteenth day of July, 1870, equal or nearly so, to that claimed by the plaintiffs. The result is, that for the nine thousand bushels of corn last purchased by the plaintiffs, they paid ten cents per bushel more than they could have bought for, when their telegram first reached Chicago, and for this difference the defendants are liable with interest from the date of the demand, July 28, 1870.

*Judgment for plaintiffs for $900, and interest from July* 28, 1870.

WALTON, DICKERSON, BARROWS and VIRGIN, JJ., concurred.