WHITE, WASHER & KING v. WESTERN UNION TELEGRAPH CO.

*(Circuit Court, D. Kansas.  June Term, 1882.)*

1. TELEGRAPH MESSAGES—NEGLIGENT TRANSMISSION—LIABILITY.

In an action for damages for negligence in the transmission of a message by a telegraph company, whereby the sender of the message suffered pecuniary loss, the burden of proof rests upon the plaintiff to show that the error or mistake occurred through the culpable carelessness and gross negligence of the operators or employes of the company; a simple mistake in transmitting a dispatch is not sufficient to render the company liable.

2. SAME—NATURAL CAUSES.

Where the errors or mistakes in the transmission of the dispatch occurred through climatic influences, such as storms, lightning, rain, or other natural causes, temporarily affecting the insulation of the wires, or the working of the instruments, the company is not responsible; as the mere fact that a mistake was made in the message transmitted would not itself authorize any recovery for more than nominal damages.

3. SAME—CONTRACT RESTRICTING LIABILITY.

A contract written at the head of a telegraph dispatch restricting the liability of the company for loss from mistake or negligence in the transmission or delivery of the dispatch, will not exonerate the company from loss or damage caused by the wanton carelessness or gross negligence of its servants, agents, or operators.

4. SAME—NEGLIGENCE.

The highest degree of care is not required of telegraph companies in the transmission of messages over its lines; if ordinary care is exercised by its agents, employes, or operators, it is sufficient to exonerate them from liability for loss or damage.

5. SAME—GROSS NEGLIGENCE.

Gross negligence is that want of care which a person habitually careless and negligent would exercise in business transactions.

This was an action to recover damages by reason of an alleged mistake in transmitting a dispatch over the lines of defendant's company. The dispatch was sent pursuant to certain regulations and conditions

as contained in the telegraph blank upon which the message was written. The original dispatch, together with the printed form upon which the same was written, is as follows, to-wit:

"*The Western Union Telegraph Company. All messages taken by this company subject to the following terms:* To guard against mistakes or delays the sender of a message should order it repeated; that is, telegraphed back to the originating office for comparison. For this one-half the regular rate is charged in addition. It is agreed between the sender of the following message and this company that said company shall not be liable for mistakes or delays in the transmission or delivery, or for non-delivery, of any unrepeated message, whether happening by negligence of its servants or otherwise, beyond the amount received for sending the same, nor for mistakes or delays in the transmission or delivery, or for non-delivery, of any repeated message beyond fifty times the sum received for sending the same, unless specially insured; nor in any case for delay arising from unavoidable interruption in the working of its lines, or for errors in cipher or obscure messages. And this company is hereby made the agent of the sender without liability to forward any message over the lines of any other company when necessary to reach its destination. Correctness in the transmission of messages to any point on the lines of this company can be insured by contract in writing, stating agreed amount of risk and payment of premium thereon at the following rates, in addition to the usual charge for repeated messages, viz.: 1 per cent. for any distance not exceeding 1,000 miles, and 2 per cent. for any greater distance. No employe of the company is authorized to vary the foregoing. The company will not be liable for damages in any case where the claim is not presented in writing within 60 days after sending the message. 6–18–1879. Send the following message, subject to the above terms, which are agreed to: '*To McGinnity, Adams & Sherry, St. Louis:* Sell fifteen July wheat; sell rye fifty-two or more.

'WHITE, WASHER & KING.'

"Read the notice and agreement at the top."

The mistake in transmitting the dispatch was in substituting the words "fifty" July wheat for the words "fifteen" July wheat, as the message was originally written, and the plaintiff's brokers having sold 50,000 bushels of wheat for July delivery, a change in the market caused loss to the plaintiffs, who claimed damages by reason of the error in transmitting the dispatch.

*Tomlinson & Griffin* and *W. W. Guthrie*, for plaintiffs.

*Everest & Waggener*, for defendant.

FOSTER, D. J., (*charging jury.*) I desire to get before your minds the facts upon which you are to pass in arriving at a verdict from the evidence in this case. There has been a great deal of discussion about the law, and some discussion upon the evidence. I will first call your attention to the issues in this case, and the facts that are admitted and uncontroverted, and the facts remaining for you to pass

upon by your verdict. It is not controverted in this case that the plaintiffs, White, Washer & King, in the month of June took to the Western Union Telegraph office, in Atchison, this dispatch for transmission to their agents at St. Louis, Missouri. It reads as follows; that is, the written part: "6–18–1879. *To McGinnity, Adams & Sherry, St. Louis*: Sell fifteen July wheat; sell rye fifty-two or more." When the dispatch was received by the parties to whom it was transmitted, in the place of fifteen it read fifty—"sell fifty July wheat." This is an error or mistake it seems that had occurred in the transmission of this dispatch from some cause or other, and in its transmission from Atchison to the persons to whom it was addressed in St. Louis. That in pursuance of the dispatch which they received they made a contract according to its directions and sold in the name of White, Washer & King, to some parties in St. Louis, fifty thousand bushels of wheat instead of fifteen. It is claimed here, and I believe it is admitted, that this dispatch, construed by the terms and understood by men dealing in grain, "fifteen" meant fifteen thousand July wheat. After the error was discovered, which was within a day or two, the plaintiffs in this case sought to relieve themselves from this contract, as it was not in accordance with what they intended to make; it was throwing a much larger burden and contract on them than they intended to enter into; and they had a conversation with the manager of the defendant company at Atchison, and stated the mistake and error, and the difficulty that it had got them into, and asked that the company should relieve them from it, and assume the responsibility and take the contract off their hands, or give some directions about it; that the company did not do so. Mr. Levin, agent of defendant at Atchison, states that he did not have authority to act in that matter; at any rate, defendant did not do so, and no action was taken on its part, and two days afterwards plaintiffs in this case made the best of terms they could to settle up with the other parties in St. Louis, and be relieved from the responsibility of this contract, and in doing so it appears they sustained a loss of something over $900. They sustained damage by reason of this error, by reason of the over amount of thirty-five thousand bushels, of nine hundred and forty some odd dollars. Now they bring this suit against the Western Union Telegraph Company to recover back these damages, alleging in their petition that the Western Union Telegraph Company, its agents, servants, and employes, were guilty of carelessness or negligence in transmitting this dispatch, and thus this mistake or error occurred, and from that arose the damages.

Now, the paper upon which this dispatch is written is a form prepared by the defendant company, and in it are certain rules and regulations limiting and restricting their liability in the transmission of the dispatch, and having been signed by the plaintiffs with these terms and conditions, which they say are agreed to, this in substance forms the contract upon which this dispatch was to be transmitted. I say it in substance forms it, and limits it.    There are some things, however, that are sought in this contract by the defendant company to relieve it from certain liability which the law will not permit, and that is that they cannot contract for immunity from damages occasioned by the culpable negligence or gross carelessness of their employes; and hence, if this mistake or this error arose from the culpable negligence or gross carelessness or willful neglect of the employes of the defendant company, then the defendant company would be responsible for the damages that the plaintiffs have sustained.    Because, while the law imposes upon this corporation, not all the duty and responsibility of a common carrier yet they owe to the public certainly some degree of care and diligence on the part of their employes and servants to transmit and deliver the message properly and safely.    I say they owe some degree, although not a high degree; perhaps a slight degree of care and diligence would be all that would be required under the law.

The burden rests upon the plaintiffs in the case to maintain the issues which they present; that is, the burden rests upon the plaintiffs to show that this error or mistake occurred through the culpable negligence or gross carelessness of the operators or employes of the defendant company.    It is not sufficient for them to say there is a mistake which has occurred in transmitting this dispatch to the office of the company in St. Louis, but they must show that it occurred through the gross carelessness or culpable negligence of the employes of the defendant company.    The defendant in this case, of course, denies this carelessness or negligence, and it further claims that it should be relieved from responsibility for the transmission of this dispatch because it was obscure; and there is a stipulation in this printed matter, upon this form, in which it stipulated for immunity for the transmission of dispatches in cipher or obscure messages. That is a reasonable stipulation, and an alternative restriction that the law would permit the company to make; that is, if the dispatch is in cipher or obscure, that they do not understand the meaning of it, if the operator does not understand the meaning of it, and did not understand the importance of the dispatch, and the necessity

of using care and diligence, and damages in consequence of that might result and naturally follow from a failure to transmit the dispatch correctly, then the law says, if the operator did not understand it, the company should not be held responsible for the damage. So these are the two questions I wish to submit to you for your determination: *First*, were the agents, servants, and employes, or operators, (perhaps I might confine it,) guilty of culpable negligence or gross carelessnes in transmitting this dispatch, and did the error or mistake arise from that culpable negligence or gross carelessness? *Next*, did the operators or employes understand what this dispatch meant, or was it obscure? These are the two questions, gentlemen of the jury, for you to determine; and I have formulated the law upon these two questions, and will read it to you. If you find from the evidence that the telegram in question was erroneously and incorrectly transmitted or received through the culpable or gross negligence of the operators in the employment of the defendant company, either at Atchison or St. Louis, or both, and that the operators understood the meaning of said telegram, then the plaintiffs are entitled to a verdict.

But if you should find from the evidence that the error was not occasioned by reason of the culpable negligence of the defendant's operators, but occurred through climatic influences, such as storms, lightning, rain, or other causes temporarily affecting the insulation of the wires, or affecting the working of the instruments, then the defendant is not responsible for the error, and is entitled to a verdict; or if this dispatch was obscure, and the operators did not understand the meaning of it, then they should not be held responsible.

Upon that point, gentleman of the jury, you have heard detailed here by the witnesses who are experts; that art, as understood at this time, is subject, under certain circumstances, to difficulties and uncertainties, and hence the reasonableness of the telegraph company to limit their legal responsibility in the transmission of dispatches; and those uncertainties and difficulties, as you have heard detailed here by the witnesses, result from various causes, mostly from climatic influences or the state of the weather. It may affect the insulation of the wires, or by striking against some other obstruction, or by being overcharged with electricity. When these things occur the witnesses tell you that they find difficulty in transmitting and receiving dispatches correctly; that the art has not become so perfect but that under certain circumstances during storms, and under certain circumstances which I have related, there is more

difficulty in transmitting dispatches; and the use of care and diligence, even, will not enable them under all circumstances to transmit the dispatches just as they should be transmitted. These things, of course, should be considered and given their proper weight, and it is for you to determine. You have heard the evidence on the other side, when the weather is clear and fair, and the line in perfect order and the instruments all right, that nothing but unwarranted carelessness or gross negligence would result in an error of this kind. This is the testimony of the witnesses on the part of the defense, and they substantially state that when the line is in order, and the instrument in order, the dispatch should be sent, unless the operator was grossly and culpably negligent, and received at St. Louis in just the exact words desired. You have heard the evidence as to the condition of the weather; you have heard the evidence as to the difficulty that the operator at St. Louis says he experienced in getting this dispatch; you have heard his testimony, that he thought there was some difficulty on the line somewhere; there seemed to be something the matter.

Now, was that error or mistake occasioned by reason of the difficulty on the line, arising from the weather or something interfering with the insulation of the wires, or something of that kind; or was it simply a matter of wanton carelessness or gross negligence on the part of either the operator sending, or the operator receiving, this message. Gentlemen, you have to determine this from the evidence in the case. If the said dispatch was not obscure to the defendant's operators, and a slight degree of care and caution on their part would have prevented the said error, and they failed to exercise such degree of care and diligence in transmitting said dispatch, then said defendant is liable for any damages occasioned the plaintiffs by reason thereof; that is, the defendant and its operators are only held to a slight degree of care and diligence.

If, however, the dispatch was obscure to the operators, or if said operators did use such slight degree of diligence to transmit said dispatch correctly, then the company is not liable in damages. Now, upon that point, as to whether that dispatch was obscure to the agent or operator of the company, that means, in substance, did the operator understand what it meant? You will have to recollect the testimony upon that point. The testimony in reference to that is that the dispatch was in the form used by men dealing in grain; that it was a form well understood by members of the board of trade in large cities and in St. Louis where this dispatch was sent; that defendant was

transmitting a multitude of dispatches each day during the grain season, and other parties than plaintiff were sending dispatches couched in similar terms; and the statement of Mr. Levin, who was the manager of defendant there, and he did not deny but what he understood it, and because he understood it he thought the other operator did. Here you have, gentlemen, the evidence as to that. It is for you to determine from all the evidence whether it is reasonably established and shown from the evidence in the case that the operators sending and receiving this dispatch understood what it meant.

There has been some talk here to the jury about dealing in options, etc., and an instruction asked on that point, which I have refused to give. In fact, I did not know there was any such evidence before the jury until the deposition was read by Mr. Everest, attorney for defendant, in his argument as evidence for the defendant; but we have Mr. King, saying that it was a real transaction; that they were grain dealers; they had some grain there, and they had contracted for the balance of it with farmers, expecting to fill the contract. I did not know there was anything on the other side; nothing was read until the argument was made. I do not think anything was sent to the jury. The defendant asks for certain instructions, some of which, although I may have given them to you, I will give certain of them as asked for, the others I refuse. Those I give are as follows: The jury are further instructed that while the dispatch in question might be understood among grain men to mean 50,000 bushels of wheat, to be delivered at any time during the month of July, 1879, yet said message, reading on its face, "Sell fifteen July wheat," would not of itself convey to the defendant or its agents any such nature or character of the dispatch, and in order for plaintiffs to recover they must establish by a preponderance of the evidence, to the satisfaction of the jury, that the agent of the defendant receiving such dispatch for transmission was informed or knew the true meaning and nature of the dispatch; that the operator was informed, or knew without being informed, if he had the information before. In order that defendant or its agents might have observed the precaution necessary to guard against the risk which might be incurred, its true intent and meaning should have been disclosed to it or its agents, and unless the jury find from the evidence that the nature and character of the dispatch were disclosed to or understood by the agents who received and transmitted such dispatch, then the plaintiffs are entitled to only nominal damages, which is the cost of sending the message, and which, in this case, is admitted to be the sum of 50 cents.

The jury are instructed that in this case it is incumbent on the plaintiffs to establish by a preponderance of the evidence every fact necessary or essential for their recovery, and the mere fact that a mistake was made in the message transmitted would not of itself authorize any recovery against defendant for anything more than nominal damages, which, in this case, is the cost of the message sent.

The jury are further instructed that before they can find for the plaintiffs for more than nominal damages the plaintiffs must establish to the satisfaction of the jury, by a preponderance of the evidence, some thing more than the mere fact that a mistake was made in the transmission of the message, but must further so establish that such mistake was on account of gross negligence, or willful misconduct of the defendant or its agents, in the transmission of such message; and if the jury find from the evidence that the defendant exercised ordinary care in the transmission of such message, and no demand was made by plaintiffs to have such message repeated, then under the terms of the contract under which such message was sent, plaintiffs can recover only the costs of sending such message. The jury are instructed that in this case in no sense is the defendant to be held liable as a common carrier or subject to the rule governing common carriers; nor is the defendant to be held as an insurer of the correct transmission of the message; nor is the defendant liable for a failure to exercise extraordinary care, or failure to exercise even ordinary care and diligence, in the transmission of this message, the same being an unrepeated message, and before the plaintiffs can recover any more than nominal damages herein, which is the price of sending the message, it is incumbent on the plaintiffs to establish by preponderance of the evidence that the defendant, its agents, or servants were guilty of gross negligence or willful misconduct in its duty herein. Gross negligence means that want of care which a person habitually careless and negligent would ordinarily exercise in business transactions, and in this case neither the highest degree of care and diligence was required of defendant, as nothing beyond the exercise of slight care was required or demanded of defendant.

The jury are instructed that the defendant would not be liable for errors or imperfections in transmitting the message which arose from causes not within its control,—that is, failure of the electrical current, irregularities in its power or efficiency, and interruptions or confusions arising from storm or wind, heat or cold; nor from imperfections in the working of the wire arising from necessary imperfections or inherent characteristics in the metals, or from things necessarily

pertaining to the business of communicating by telegraph, or the machinery and implements invented for the purpose.

On the part of the plaintiffs I give you the following: If the jury believe from the evidence that the mistake was made in transmitting the message through the gross negligence of the defendant or its agents and servants and that plaintiffs suffered damage by reason of such mistake in transmitting said message, the defendant is responsible for such damage, although the jury may believe from the evidence that plaintiff used one of the forms of defendant having the terms printed at the top, as shown by the form set up in the answer to plaintiffs' petition, and that said plaintiffs assented and agreed to such terms, and did not require said message to be repeated, or its correct transmission insured.

Gentlemen of the jury, if you find for the plaintiffs in this case—if you find the plaintiffs are entitled to a verdict—the measure of damage will be $943.05, with interest at 7 per cent. from the date of the demand, which is July 11, 1879; unless you should believe their right to recover upon the obscurity of the dispatch, or the liability of the company arising alone on the obscurity of the dispatch: in that case I would say as defendant claims, that plaintiffs are entitled to nominal damages only, it does not deny but what it is liable for cost of sending the message. You will find either one thing or the other.

Gentlemen, you have got the form of the verdicts, and will fill the blanks as you may find and assess the damages.

---

TELEGRAPH COMPANIES—THE NATURE OF THEIR SERVICE. A telegraph company is a public agency, and is subject to public regulation and control.(a) It is bound, therefore, to receive and transmit messages for all impartially; and it cannot give a preference to one individual or corporation over another. To this extent its nature and duties are those of a common carrier, and it would seem to follow that, as regards its liabilities for the performance of its functions, it should be held to the same extent as a common carrier under the rules of the common law. In an early case in California,(b) the court went as far as this. "The rules of law which govern the liability of telegraph companies," said BALDWIN, J., "are not new. Such companies hold themselves

(a) Western U. Tel. Co. v. Carew, 15 Mich. 525; New York, etc., Tel. Co. v. Dryburg, 35 Pa. St. 302; Bartlett v. Western U. Tel. Co. 62 Me. 217; De Rutte v. New York, etc., Tel. Co. 30 How. Pr. 413; 1 Daly, 517; Wann v. Western U. Tel. Co. 37 Mo. 481; Tyler v. Western U. Tel. Co. 74 Ill. 168;

Parks v. Alta California Tel. Co. 13 Cal. 422; Passmore v. Western U. Tel. Co. 78 Pa. St. 242; Ellis v. American Tel. Co. 13 Allen, 226.

(b) Parks v. Alta California Tel. Co. 13 Cal. 422.

out to the public as engaged in a particular branch of business in which the interests of the public are deeply concerned. They propose to do a certain service for a given price. There is no difference in the general nature of the legal obligation of the contract between carrying a message along a wire and carrying goods or a package along a route. The physicial agency may be different, but the essential nature of the contract is the same. The breach of contract in one case or the other is or may be attended with the same consequences; and the obligation to perform the stipulated duty is the same in both cases. The importance of the discharge of it in both respects is the same. In both cases the contract is binding, and the responsibility of the parties for the breach of duty is governed by the same general rules." A similar opinion was expressed in the English court of common pleas in 1855,(c) JERVIS, C. J., saying that the defendant company was "in the nature of a carrier who would have a certain liability imposed upon him at common law, but they might limit this liability by special notice, as a carrier could, subject to the condition or qualification that they could not limit it to the extent of protecting themselves against the consequences of their gross negligence." Later English cases(d) appear to qualify this expression; but the absorption of the telegraph companies in Great Britain by the government changes their relation to the people of that country to a considerable extent. In the United States, excepting a *nisi prius* decision of little authority,(e) the rule of the California court has not been followed, and telegraph companies are not held to the extraordinary responsibilities of common carriers; that is to say, they are not insurers of the correct transmission of the messages received by them, excepting the act of God and the public enemy.(f) The reasons for this doctrine are generally said to be best stated by JOHNSON, J., in a case decided in New York in 1866: "The business in which the [company] is engaged, of transmitting ideas only from one point to another by means of electricity, operating upon an insulated and extended wire, and giving them expression at the remotest point of delivery by certain mechanical sounds, or by marks or signs indented, which represent words or single letters of the alphabet, is so radically and essentially different, not only in its nature and character, but in all its methods and agencies, from the business of transporting merchandise and material substances from place to place by common carriers, that the peculiar and stringent rules by which the latter are controlled and regulated can have very little just and proper application to the former. And all attempts heretofore made by courts to subject the two kinds of business to the same legal

(c) McAndrew v. Electric Tel. Co. 17 C. B. 3.

(d) Dickson v. Renters' Tel. Co. 3 C. P. Div. 7; 2 C. P. Div. 62.

(e) Bowen v. Lake Erie Tel. Co. 1 Amer. Law Reg. 685; Allen, Tel. Cas. 7.

(f) Binney v. New York, etc., R. Co. 18 Md. 341; New York, etc., Tel. Co. v. Dryburg, 35 Pa. St. 298; Shields v. Washington, etc. Tel. Co. 11 Amer. Law T. 311; Allen, Tel. Cas. 7; De Rutte v. New York, etc., Tel. Co. 1 Daly, 547; Breese v. United States Tel. Co. 45 Barb. 274; Western U. Tel. Co. v. Ward, 23 Ind. 377; Western U. Tel. Co. v. Carew, 15 Mich. 525; Ellis v. American Tel. Co. 13 Allen, 226; United States Tel. Co. v. Gildersleeve, 28 Md. 232; Baldwin v. United States Tel. Co. 45 N. Y. 744; 54 Barb. 505; 6 Abb. Pr. (N. S.) 405; 1 Lans. 125; Leonard v. New York, etc., Tel. Co. 41 N. Y. 544; Passmore v. Western U. Tel. Co. 78 Pa. St. 238; Bryant v. American Tel. Co. 1 Daly, 575; De Rutte v. New York, etc., Tel. Co. 30 How. Pr. 403; 1 Daly, 517; Wann v. Western U. Tel. Co. 37 Mo. 472; Washington, etc., Tel. Co. v. Hobson, 15 Grat. 122; Bartlett v. Western U. Tel. Co. 62 Me. 209; Western U. Tel. Co. v. Fontaine, 58 Ga. 433; Camp v. Western U. Tel. Co. 1 Metc. (Ky.) 164; Aiken v. Tel. Co. 5 S. C. 253.

rules and liabilities will, in my judgment, sooner or later have to be abandoned as clumsy and indiscriminating efforts and contrivances, which have no natural relation or affinity whatever, and at best but a loose and mere fanciful resemblance. The bearer of written or printed documents and messages from one to another, if such was his business or employment, might very properly be called and held a common carrier; while it would obviously be little short of an absurdity to give that designation or character to the bearer of mere verbal messages, delivered to him by mere signs of speech, to be communicated in like manner. The former would have something which is or might be the subject of property, capable of being lost, stolen, or wrongfully appropriated, while the latter would have nothing in the nature of property which could be converted or destroyed, or form the subject of larceny, or of tortious caption and appropriation even by the king's enemies."(g)

DEGREE OF CARE AND DILIGENCE REQUIRED. Nevertheless, the degree of care which telegraph companies are bound to exercise, if properly laid down and applied, will, perhaps, render their service as efficient, so far as the public is concerned, as though they were held to the engagement of insurers. Not that there have not been considerable difference of opinion and some apparently illogical reasoning in the courts. Thus some courts, as in the principal case, have held them to a very low degree of care, while others have adopted a better standard. "Due and reasonable care,"(h) "exact diligence,"(i) "ordinary care and diligence,"(j) are phrases which have been used to describe this latter requisite. They, however, all tend to require on the part of the companies "the use of good apparatus and instruments, and reasonable skill, and a high degree of care and diligence in their operation."(k)

POWER TO LIMIT LIABILITY. It being now settled by an overwhelming weight of authority that a common carrier may limit his liability by a special contract made with his customer,"(l) it is hardly possible to doubt that the same freedom to enter into agreements prescribing the methods of carrying out its service, and the circumstances under which it is to be liable, must be given to a telegraph company. Accordingly, it has been expressly held in a number of cases that a telegraph company may limit its ordinary liability by a contract or a notice assented to by the sender of the message."(m)

NEGLIGENCE CANNOT BE CONTRACTED AGAINST. But a common carrier is not permitted to get rid of its liability for an act of negligence on its part by a contract or agreement with its customer.(n) Neither, and for the same

(g) Breese v. United States Tel. Co. 45 Barb. 274; 31 How. Pr. 86.

(h) Ellis v. American Tel. Co. 13 Allen, 226.

(i) Passmore v. Western U. Tel. Co. 78 Pa. St. 238.

(j) Baldwin v. United States, etc., Tel. Co. 13 Allen, 226.

(k) Western U. Tel. Co. v. Carew, 15 Mich. 525.

(l) See Lawson on Carriers, § 28 et seq. and cases cited.

(m) McAndrew v. Electric Tel. Co. 17 C. B. 3; Young v. Western U. Tel. Co. 65 N. Y. 163; Breese v. United States Tel. Co. 48 N. Y. 132; De Rutte v. New York, etc., Tel. Co. 1 Daly, 547; Sweatland v. Illinois, etc., Tel. Co. 27 Iowa, 433;

Manville v. Western U. Tel. Co. 37 Iowa, 214; Western U. Tel. Co. v. Buchanan, 35 Ind. 429; Western U. Tel. Co. v. Tyler, 74 Ill. 168; 60 Ill. 421; Passmore v. Western U. Tel. Co. 78 Pa. St. 238; 9 Phila. 90; Harris v. Western U. Tel. Co. 9 Phila. 88; Wolf v. Western U. Tel. Co. 62 Pa. St. 83; Western U. Tel. Co. v. Carew, 15 Mich. 525; Wann v. Western U. Tel. Co. 37 Mo. 473; United States Tel. Co. v. Gildersleeve, 29 Md. 232; Camp v. Western U. Tel. Co. 1 Metc. 164; Western U. Tel. Co. v. Graham, 1 Cal. 230; Ellis v. American Tel. Co. 13 Allen, 226; Redpath v. Western U. Tel. Co. 112 Mass. 71; Grinnell v. Western U. Tel. Co. 113 Mass. 299.

(n) Lawson on Carriers; § 28 et seq.

reasons of public policy, can a telegraph company escape liability for the consequences of the negligence of itself or its duly-authorized agents.(o) Some courts, however, have restricted this lack of power to contract, to what is called "gross" negligence.(p) A better rule, however, has been laid down in the majority of the decisions, viz., that notwithstanding a condition in the contract between the sender and the company, the latter will still be liable for mistakes happening in consequence of its own fault, such as want of proper skill, or ordinary skill, on the part of its operatives, or the use of defective instruments, but will not be liable for mistakes occasioned by causes beyond its control, such as atmospheric changes, or the vagaries of electricity, provided these mistakes could not have been avoided by the exercise of ordinary care and skill on the part of the operating agents of the company.(q)

CONDITIONS AS TO REPEATING MESSAGES. The blanks of a telegraph company usually contain a condition that if the message is not repeated—for which service an extra charge is asked—the company shall not be liable beyond a certain small amount; generally the sum paid for the telegram, or fifty times its amount. Such conditions are sustained as reasonable; but at the same time they are not allowed to exclude the company's liability for negligence.(r) They are, however, a sufficient protection where the mistake or delay is not due to the negligence of the company or its servants.(s)

OTHER CONDITIONS. Other conditions have been sustained as reasonable, viz., that the company shall not be liable unless the claim is presented within 60 days after sending the message.(t)

KNOWLEDGE BY SENDER OF CONDITIONS. Of course there can be no contract between the sender and the company, which the latter can set up to restrict its liability, unless it has been assented to by the former. But notice of the company's regulations, and the conditions which it seeks to put upon the sender, are given to him by printing them on the blanks upon which the message is written, and by the sender using the blanks without dissent he is taken to assent to the conditions which they contain,(u) and he will not be

permitted to show that he did not read or understand the conditions.(*v*) For the same reason, if a person is familiar with the regulations of the company—as by having sent previous messages—he will be taken to have assented to those conditions if he sends a dispatch written on a business card of his own.(*w*)

BURDEN OF PROOF. From the fact that the company has failed to deliver the message as sent, the presumption of negligence arises, and the burden of proof is therefore on the company to show that the failure arose from a cause for which they are not legally responsible to answer.(*x*)

REFUSAL TO TRANSMIT. We have seen(*a*) that the company cannot legally refuse to send a message for any one tendering, and that it cannot give a preference to one person or corporation over another.(*b*) It has been held that it may refuse to send a dispatch which is expressed in indecent, obscene, or filthy language; but that, if such does not appear on the face of the dispatch, it cannot justify a refusal to transmit it, on the ground that the message was sent for an illegal or immoral purpose.(*c*)

MEASURE OF DAMAGES. The rule as to the measure of damages in actions against telegraph companies is well stated by EARL, C. J., in a New York case:(*d*) "The damages must be such as the parties may fairly be supposed to have contemplated when they made the contract. Parties entering into contracts usually contemplate that they will be performed, and not that they will be violated. They very rarely actually contemplate any damages which would flow from any breach, and very frequently have not sufficient information to know what such damages would be. * * * A party is liable for all the direct damages which both parties to the contract would have contemplated as flowing from its breach, if, at the time they entered into it, they had bestowed proper attention upon the subject, and had been fully informed of the facts." As a rule, the actual damages sustained by the plaintiff are recoverable. Thus, where a dispatch ordering "one shawl," which, when delivered, read "one hundred shawls;" (*e*) where the message, as delivered to the operator, read "two hand bouquets," but, as delivered to the receiver, read "two hundred bouquets;" (*f*) where the company delivered an incorrect market report;(*g*) where the message was never sent as ordered;(*h*) where an

(*v*) Grinnell v. Western Union Tel. Co. 113 Mass 299; Redpath v. Western Union Tel. Co. 112 Mass. 71; Breese v. United States Tel. Co. 48 N. Y. 132; 45 Barb. 174; Young v. Western Union Tel. Co. 65 N. Y. 163; Wolf v. Western Union Tel. Co. 62 Pa. St. 83; Western Union Tel. Co. v. Buchanan, 35 Ind. 429.

(*w*) Western Union Tel. Co. v. Buchanan, 35 Ind. 429.

(*x*) Baldwin v. U. S. Tel. Co. 45 N. Y. 744; De Rutte v. N. Y. Tel. Co. 1 Daly, 547; 30 How. Pr. 413; Rittenhouse v. Independent Line, 44 N. Y. 263; Turner v. Hawkeye Tel. Co. 41 Iowa, 458; Bartlett v. Western Union Tel. Co. 62 Me. 209; Dorgan v. Telegraph Co. 1 Amer. Law T. Rep. 406; Western Union Tel. Co. v. Carew, 15 Mich. 525; Tyler v. Western Union Tel. Co. 74 Ill. 168; 60 Ill. 421. Contra, Sweatiana v. Illinois,

etc., Tel. Co. 29 Iowa, 433; United States Tel. Co. v. Gildersleeve, 29 Md. 232.

(*a*) Ante, § 1.

(*b*) See, also, Western Union Tel. Co. v. Ward, 23 Ind. 377; United States Tel. Co. v. Western U. Tel. Co. 56 Barb. 46; Davis v. Western Union Tel. Co. 1 Cin. 100

(*c*) Western Union Tel. Co. v. Ferguson, 57 Ind. 495.

(*d*) Leonard v. New York, etc., Tel. Co. 41 N. Y. 514.

(*e*) Bowen v. Lake Erie Tel. Co. 1 Amer. Law Reg. 685.

(*f*) New York, etc., Tel. Co. v. Dreyburg, 3 Phila. 408; 35 Pa. St. 298.

(*g*) Turner v. Hawkeye Tel. Co. 41 Iowa, 458.

(*h*) Sprague v. Western U. Tel. Co. 52 Ind. 1; Manville v. Western U. Tel. Co. 37 Iowa, 214; De Rutte v. New York, etc., Tel. Co. 1 Daly, 547; 30

order for 5,000 "sacks" of salt was delivered as calling for 5,000 "casks;"(*i*) where there was a mistake in a message ordering stock sold and other stock purchased;(*j*) where wheat was ordered to be purchased at "22" and the message, as delivered, said "25;"(*k*) where the name of the receiver was misspelled,(*l*)—in all these cases the actual damages sustained by the parties were recovered.

But, on the other hand, where the company is at fault, it cannot be held liable where this fault is not the proximate cause of the loss. Thus, A. telegraphs to B. to send him $500. The message, as negligently delivered, asked for $5,000. In accordance with the request B. sent $5,000, which A. absconded with. It was held that the company was not responsible at the suit of B.(*m*) And uncertain and contingent profits are not recoverable;(*n*) nor are any damages recoverable where the terms of the message, as delivered to the operator, are obscure, and are so unintelligible to him that he is unable to understand its import or its importance. But this rule is subject to the qualification that the agents of a telegraph company will be held to possess such experience as to enable them to comprehend what might be unintelligible to others; in other words, the employes of telegraph companies will be presumed to be acquainted with the language of merchants, and the forms used by business men in telegraphing their orders, replies, and contracts.(*o*)

CONNECTING LINES. The decisions are not uniform as to the company's liability for an injury on a connecting line. Under the English rule, applicable to carriers of all kinds, the first carrier alone is liable. In some of the American states the rule is different, and the carrier on whose line the loss occurs may be sued. On the other hand, a telegraph company receiving a message directed to a place beyond its lines, and receiving payment for the extra service, is liable for the negligence of any connecting line, for they are its agents in the service, and not the sender's.(*p*)

WHO MAY BRING ACTION. In England, the recipient of a message cannot maintain an action against the company for damages caused by its negligence. The obligation on the part of the company is one of contract with the sender, to which the receiver is not a party, and under which he can claim no rights. In the United States this technical rule is not recognized, but a telegraph company may be sued by the party to whom a message is addressed for damage resulting from its neglect.(*q*)                    JOHN D. LAWSON.

How. Pr. 403; Davis v. Western U. Tel. Co. 1 Cin. 100; Parks v. Alta California Tel. Co. 13 Cal. 422.

(*i*) Leonard v. New York, etc., Tel. Co. 41 N. Y. 554.

(*j*) Rittenhouse v. Indiana, etc., Tel. Co. 1 Daly, 474; 44 N. Y. 263.

(*k*) De Rutte v. New York, etc., Tel. Co. 1 Daly. 547.

(*l*) Lausberger v. Magnetic, etc., Tel. Co. 32 Barb. 530.

(*m*) Lowery v. Western Union Tel. Co. 60 N. Y 198. And see Western Union Tel. Co. v. Meyer, 61 Ala. 153.

(*n*) Kinghorne v. Montreal Tel. Co. 18 U. C. Q. B. 60; Lane v. Montreal Tel. Co. 7 U. C. C. P. 73;

Beaupre v. Pacific, etc., Tel. Co. 21 Minn. 155; Breese v. United States Tel. Co. 45 Barb. 275; Hibbard v. Western U. Tel. Co. 33 Wis. 558; Western U. Tel. Co. v. Graham, 1 Col. 230; Squire v. Western U. Tel. Co. 98 Mass. 232; True v. International Tel. Co. 60 Me. 9; McCall v. Western Union Tel. Co. 7 Abb. N. C. 151.

(*o*) Thomp. Neg. 857, and cases cited.

(*p*) De Rutte v. Albany, etc., Tel. Co. 1 Daly, 547.

(*q*) New York, etc., R. Co. v. Dreyburg, 35 Pa. St. 298; Elwood v. Western Union Tel. Co. 45 N. Y. 549; Rose v. United States Tel. Co. 6 Rob. 305; Western Union Tel. Co. v. Carew, 15 Mich. 525.